IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EDWARD P. BEARD, JR.,

Plaintiff,

v.

ARIK HELMAN, *et al.*,

Defendants.

No. 4:21-CV-00680

(Chief Judge Brann)

**MEMORANDUM OPINION**

**MARCH 31, 2022**

Presently before the Court is Defendants' motion for summary judgment.[1] This motion, having been fully briefed,[2] is ripe for disposition. For the following reasons, the Court will grant in part and deny in part Defendants' motion.

## I.   BACKGROUND[3]

The genesis of this dispute occurred in 2008, when Edward P. Beard, Jr., and Arik Helman attended the Florida Renaissance Fair as vendors and discussed Helman's difficulty manufacturing a boot button with a dragon image on the button.[4] Over the course of the next week, Beard created a circular image of a dragon (the

---

[1]   Doc. 6. The motion was originally filed as a motion to dismiss but, in January 2022, this Court converted the motion to a motion for summary judgment so that it could consider matters outside of the pleadings and determine whether the parties entered into a binding settlement agreement. Doc. 10.

[2]   Docs. 7, 8, 9, 13, 14.

[3]   Because this motion is one for summary judgment, the Court must "view the facts and make all reasonable inferences in the non-movant's favor." *TitleMax of Del., Inc. v. Weissmann*, 24 F.4th 230, 236 (3d Cir. 2022).

[4]   Doc. 13-2 ¶¶ 5-7; Doc. 14-2 ¶¶ 2-7.

"Image") and orally offered to license the Image for Helman's use;[5] although the exact scope of the licensing agreement is in dispute, Helman acknowledges that Beard "produce[d] a specific licensing [agreement] for [Defendants] to use [the Image] solely for [their] footwear products."[6]

It is undisputed that there were several terms attached to the license.[7] First, Defendants must always attribute the Image to Beard with his copyright of the Image noted.[8] Second, Defendants must receive Beard's approval prior to the sale of any item that featured the Image.[9] Third, the parties agreed that they would cross-promote each other's businesses once buttons that featured the Image went on sale.[10] Beard also requested that, once the boot buttons were complete, Defendants provide him with a pair of boots that feature the buttons, although Helman asserts that the parties only agreed that Helman would provide Beard with "a set of the hardware."[11]

Despite the creation of the Image in 2008, it took several years of work to turn the Image into a design that was suitable for use in a boot button. Over the following

---

[5]  Doc. 13-2 ¶¶ 9-10; Doc. 14-2 ¶¶ 8-10.

[6]  Doc. 13-1 at 18. In their statement of facts, Defendants assert that their "belief is currently, and has always been [their] belief, that Defendants received a license to use the [Image] broadly on their products." Doc. 14-1 ¶ 4. Beard also acknowledged at times that the Image may be used on other items. *See* Doc. 13-1 at 19 (Beard stating that he had expected Helman would provide him with "any other item that you use the buttons on"); *id.* at 17 (Beard stating that he "was hoping to have hat pins or belt buckles, etc." that featured the Image).

[7]  Beard sets forth the alleged terms in his declaration, Doc. 13-2 ¶ 12, and three of these terms are not contradicted by Defendants in either their statement of facts or in Helman's declaration. *See* Docs. 14-1, 14-2.

[8]  Doc. 13-2 ¶ 12(b); *see* Doc. 13-1 at 19.

[9]  Doc. 13-2 ¶ 12(c).

[10]  *Id.* ¶ 12(d).

[11]  Doc. 13-1 at 18-19.

two years, Beard and Helman had several discussions regarding the difficulty that Helman was having with creating a mold and casting the Image into a button form, as it was difficult to reduce the size of the Image and retain any meaningful level of detail in the resulting mold.[12] Beard and Helman then had no communication for several years.[13]

In 2019, Defendants were able to create a mold of sufficient quality and began producing boot buttons that featured the Image (the "Boot Buttons").[14] Beard contacted Helman in July 2020 after learning through a third party that Defendants had begun producing and selling the Boot Buttons without first obtaining Beard's consent.[15]

This sparked a series of emails and Facebook message exchanges between Beard and Helman that form a core portion of this motion for summary judgment. On July 20, 2020 at 10:21 a.m., Beard emailed Helman regarding the Boot Buttons, and asserted that, in 2008, the parties had agreed that Helman may use the Image for boot buttons and, "in exchange," Helman was to: (1) provide Beard with a pair of boots that incorporated the Boot Buttons; (2) acknowledge that the artwork was licensed from Beard "with the appropriate copyright date"; and (3) contact Beard prior to selling the Boot Buttons.[16] Beard asserted that Helman may "correct this"

---

[12]   Doc. 14-2 ¶¶ 14-19; Doc. 13-1 at 17.
[13]   Doc. 13-2 ¶ 15; Doc. 14-2 ¶ 20.
[14]   Doc. 14-2 ¶ 22.
[15]   Doc. 13-1 at 19-20; Doc. 13-2 ¶¶ 15-16; Doc. 14-2 ¶ 24.
[16]   Doc. 13-1 at 19-20.

issue by doing three things: (1) announce that the artwork used on the Boot Buttons was officially licensed from Beard and update all of Defendants' prior social media posts regarding the Boot Buttons to include said language; (2) add a link to Beard's website with every social media post that mentioned the Boot Buttons; and (3) provide Beard with a pair of boots that utilized the Boot Buttons.[17]

At 12:54 p.m. on the same day, Helman sent a reply email to Beard, in which he acknowledged that Helman licensed the Image to him, that he failed to notify Beard prior to listing the Boot Buttons for sale, and that he failed to properly attribute the Image to Beard.[18] Helman offered to provide Beard "with the hardware [he] promised" and make the requested changes to Defendants' social media posts and offer "some additional layer of active cross" promotion.[19] Beard replied by asserting that Helman's offer to provide Beard with "boot buttons is an insult."[20]

After some back and forth between Beard and Helman, on July 20, 2020 at 5:39 p.m., Beard reiterated that an "acceptable . . . remedy" for him would be for Defendants to: (1) "[u]pdate all of your current postings with the phrase 'officially license artwork by Ed Beard Jr' used with permission"; (2) include a link to Beard's website in all of Defendants' social media posts that reference the Boot Buttons; and (3) provide Beard with a pair of boots that include the Boot Buttons.[21] Helman

---

[17] *Id.* at 20-21.
[18] *Id.* at 17-19.
[19] *Id.* at 18.
[20] *Id.* at 16.
[21] *Id.* at 14.

replied on July 21, 2020 at 2:26 p.m., stating that he would update all social media posts to include the requested language, provide a link to Beard's website, and note that the Image was copyrighted by Beard; Helman made no mention of providing Beard with the requested boots.[22]

On July 21, 2020 at 8:19 p.m., Beard sent a Facebook message to Helman stating that the proposed copyright and licensing language that would be included in Defendants' social media posts "looks good."[23] Nevertheless, Beard emphasized that Helman had not addressed the request for boots which, Beard noted, was "a deal breaker."[24] Due to this outstanding issue, Beard asserted that "we're not in an agreement stage right now[,] we're just in an understanding up to a certain point."[25] Several minutes later, at 8:35 p.m., Helman responded via Facebook message "[p]lease let me know the size you would like. Confirm the exact writing you would like to appear and we can conclude this transaction."[26] Just over one hour later, Helman sent an email to Beard stating that, "to move forward," Beard must confirm the accreditation language and sent information related to the boots.[27] Helman further stated, "I also think that it would be prudent if we reduce the renegotiation

---

[22] *Id.* at 13.
[23] *Id.* at 23.
[24] *Id.*
[25] *Id.*
[26] *Id.* at 24.
[27] *Id.* at 9.

of this agreement into a writing so that we do not have to have another discussion like this in 2030."[28]

Thirteen minutes after that email, Beard responded in a Facebook message, stating that Helman had refused on three occasions to agree to provide Beard with the requested boots and, as a result, Beard was "done" negotiating and his "attorney will be in touch" with Helman.[29] Beard and Helman then exchanged several emails and Facebook messages wherein Helman insisted that they had reached an agreement to settle the matter, while Beard insisted that they had not and that Helman must immediately cease using the Image in any products.[30]

Unsatisfied with the attempted resolution of the parties' dispute, Beard filed suit against Defendants in April 2021.[31] In his complaint, Beard asserts claims of copyright infringement (Count One), contributory copyright infringement (Count Two), vicarious infringement (Count Three), and breach of contract (Count Four).[32]

## II. DISCUSSION

### A. Standard of Review

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."[33] The United States Supreme

---

[28] *Id.* at 10.
[29] *Id.* at 24.
[30] *Id.* at 3-9, 25.
[31] Doc. 1.
[32] *Id.*
[33] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Court has advised that Federal Rule of Civil Procedure 56 "should be interpreted in a way that allows it to accomplish this purpose."[34] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[35]

Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[36] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[37] And a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[38]

A judge's task when "ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[39] Thus, if "the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the

---

[34]  *Id.* at 324.
[35]  Fed. R. Civ. P. 56(a).
[36]  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (internal quotation marks omitted).
[37]  *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
[38]  *Id.*
[39]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[40]

"The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."[41] Part of the judge's role at this stage is to ask "whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."[42] In answering that question, the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[43]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[44] For example, while "at the motion-to-dismiss stage of proceedings a district court is obligated to accept the allegations in a plaintiff's complaint as true, it does not accept mere allegations as true at the summary judgment stage."[45] The moving party must identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine

---

[40] *Id.*

[41] *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252).

[42] *Liberty Lobby*, 477 U.S. at 252 (brackets and internal quotation marks omitted).

[43] *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[44] *Celotex*, 477 U.S. at 323.

[45] *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 330 (3d Cir. 2016).

issue of material fact."[46] "Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[47]

For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (1) citations to particular parts of materials in the record that go beyond mere allegations; (2) a showing that the materials cited do not establish the absence or presence of a genuine dispute; or (3) a display that an adverse party cannot produce admissible evidence to support the fact.[48]

When the movant properly supports his motion, the nonmoving party must show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[49] The nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[50] Instead, it must "identify those facts of record which would contradict the facts identified by the movant.'"[51] Moreover, "if a party fails to properly support an assertion of fact or

---

[46] *Id.* (internal quotations omitted).

[47] *Id*.

[48] Fed. R. Civ. P. 56(c)(1).

[49] *Liberty Lobby*, 477 U.S. at 250.

[50] *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

[51] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003).

fails to properly address another party's assertion of fact as required by Rule 56(c)" the Court may "consider the fact undisputed for purposes of the motion."[52] On a motion for summary judgment, "the court need consider only the cited materials, but it may consider other materials in the record."[53]

Finally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[54] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[55]

### B.    Analysis

Defendants assert that summary judgment is appropriate for three reasons.[56] First, they contend that the email and Facebook messages exchanged between Helman and Beard resulted in a binding settlement agreement as to the claims raised in the complaint, meaning that the complaint must be dismissed.[57] Second, Defendants assert that Beard's request for statutory damages and attorneys' fees for copyright infringement are barred because the alleged infringement occurred prior to the effective date of Beard's copyright registration.[58] Third, Defendants argue that

---

[52]   Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[53]   Fed. R. Civ. P. 56(c)(3).

[54]   *Liberty Lobby*, 477 U.S. at 249.

[55]   *Id*. at 249-50 (internal citations omitted).

[56]   Defendants initially argued that any claims are barred by the applicable statutes of limitations, but have since withdrawn that assertion without prejudice to their right to raise this issue again in the future. Doc. 14 at 20-21.

[57]   Doc. 7 at 7-9; Doc. 9 at 2-7; Doc. 14 at 4-20.

[58]   Doc. 7 at 10-11; Doc. 9 at 7-12; Doc. 14 at 20.

Beard lacks standing to claim copyright infringement, as he granted an exclusive license to Defendants to use the Image.[59]

### 1.   Whether the Parties Entered into a Settlement Agreement

The parties primarily dispute whether they entered into a settlement agreement that resolved the issues raised in Beard's complaint. Defendants assert that the email and Facebook exchanges between Beard and Helman in July 2020 resulted in a settlement agreement whereby Beard settled his claims in exchange for (1) an acknowledgment that the Image was copyrighted by Beard and used with his permission, (2) a link to Beard's website in all social media posts for the Boot Buttons, and (3) a pair of boots featuring the Boot Buttons.[60] Beard responds that no agreement was ever reached, as: (1) the emails were simply negotiations, and no final terms were ever reached; (2) no consideration was offered, as Defendants were already legally obligated to provide those items pursuant to the original terms of the license; and (3) any purported agreement is void due to Helman's fraudulent misrepresentations made during the negotiations.[61]

Unfortunately, the parties rely in large part on their individual recollections of an oral licensing agreement that was reached approximately fourteen years ago. Unsurprisingly, the parties dispute some of the basic terms and conditions of that agreement. Memories are, under the best of circumstances, fallible, and even more

---

[59]   Doc. 7 at 13-14; Doc. 9 at 12-14; Doc. 14 at 21-22.
[60]   Doc. 7 at 7-9.
[61]   Doc. 13 at 21-27.

so given "the inevitable dimming of witnesses' memories"[62] that accompanies the passage of so much time. This is why a competent attorney will advise his or her client to reduce any agreement to a signed writing. Unfortunately, the parties here were not represented by attorneys in 2008, and the agreement was never put into writing. The resulting ambiguity in the agreement and the unsurprising conflicting accounts of that agreement force the Court to conclude—as discussed below—that genuine issues of material fact prevent it from definitively determining the terms of any license or concluding that a settlement agreement was or was not reached here. Rather, these are issues that must be decided by the ultimate finder of fact in this case or, at the very least, must await resolution until the completion of discovery.

As an initial matter, it is long established under Pennsylvania law that "[a] settlement agreement is essentially a contract that is binding on the parties thereto, and is governed by contract law principles."[63] "To be enforceable, a settlement agreement must possess all the elements of a valid contract—offer, acceptance, and consideration or a meeting of the minds."[64] "Further, an oral settlement agreement may be enforceable and legally binding without a writing."[65] "Where parties have

---

[62]   *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 80 (3d Cir. 2012).

[63]   *Mandler v. Commonwealth*, 247 A.3d 104, 114 (Pa. Commw. Ct.), *aff'd*, 263 A.3d 551 (Pa. 2021).

[64]   *Baribault v. Zoning Hearing Bd. of Haverford Twp.*, 236 A.3d 112, 118 (Pa. Commw. Ct. 2020) (citing *Muhammad v. Strassburger, McKenna, Messer, Shilobod & Gutnick*, 587 A.2d 1346, 1349 (Pa. 1991)).

[65]   *Id.* (brackets and internal quotation marks omitted).

reached an oral agreement, the fact that they intend to reduce the agreement to writing does not prevent enforcement of the oral agreement."[66]

### i.      Whether There was Offer and Acceptance

As to the issue of offer and acceptance, Defendants assert that Beard made an unconditional offer to settle any claims in his email to Helman sent at 5:39 p.m. on July 20, 2020, and that Helman accepted that offer by, at the latest, 9:47 p.m. on July 20, 2020, when he requested Beard's boot preferences to complete performance of that portion of the agreement.[67] Beard in turn argues that the email exchanges evidence a continued negotiation toward a possible settlement that was never finalized.[68]

In Pennsylvania, "it is essential to the enforceability of a settlement agreement that the minds of the parties should meet upon all the terms, as well as the subject matter, of the agreement."[69] In that regard, "[n]othing is better settled than that in order to constitute a contract there must be an offer on one side and an unconditional acceptance on the other" and, therefore, "[s]o long as any condition is not acceded to by both parties to the contract, the dealings are mere negotiations and may be terminated at any time by either party while they are pending."[70] "An offer is a manifestation of willingness to enter into a bargain, so made as to justify another

---

[66]   *Id.* (internal quotation marks omitted).
[67]   Doc. 14 at 5-10.
[68]   Doc. 13 at 21-25.
[69]   *Baribault*, 236 A.3d at 118.
[70]   *Quiles v. Fin. Exch. Co.*, 879 A.2d 281, 285 (Pa. Super. Ct. 2005).

person in understanding that his assent to that bargain is invited and will conclude it."[71]

Importantly,

> An alleged acceptance of an offer is not unconditional and, therefore, is not an "acceptance" if it materially alters the terms of the offer. As such, a reply which purports to accept an offer, but instead changes the terms of the offer, is not an acceptance, but, rather, is a counter-offer, which has the effect of terminating the original offer. Further, it is well established that the acceptance of any offer or counter-offer must be "unconditional and absolute."[72]

"In addition, an offeree's power of acceptance may be terminated by rejection or by a counteroffer that materially alters the terms of the offer."[73] In determining whether an offer or counteroffer has been accepted, Pennsylvania courts will look to the conduct of the parties, as "an offer may be accepted by conduct and what the parties do pursuant to the offer is germane to show whether the offer is accepted."[74]

Here a close reading of the email and Facebook message exchanges between Beard and Helman in July 2020 demonstrates that a genuine issue of material fact remains as to whether the parties reached a binding settlement agreement. Beard's first email to Helman could be construed as a settlement offer. In that email, sent on July 20, 2020 at 12:14 a.m., Beard noted that he was "pissed and . . . would rather

---

[71] *O'Brien v. Nationwide Mut. Ins. Co.*, 689 A.2d 254, 258 (Pa. Super. Ct. 1997) (internal quotation marks omitted).

[72] *Salutations, Inc. v. Paradies Shops, L.L.C.*, No. 957 WDA 2018, 2019 WL 5581538, at *4 (Pa. Super. Ct. Oct. 29, 2019) (quoting *Yarnall v. Almy*, 703 A.2d 535, 538-539 (Pa. Super. Ct. 1997)).

[73] *Id.*

[74] *United Env't Grp., Inc. v. GKK McKnight, LP*, 176 A.3d 946, 963 (Pa. Super. Ct. 2017).

just simply file" suit against Helman but that Beard's attorney insisted that Beard provide Helman "the opportunity to do the right thing."[75] Beard then appears to have made a three prong offer to settle the matter, although some of those terms are somewhat ambiguous: (1) update all social media posts that mention the Boot Buttons to state that the Image was copyrighted by Beard and licensed by Defendants; (2) include a link in all such posts to Beard's website; and (3) provide Beard with a pair of boots that had the Boot Buttons on them.[76]

Even if this email is construed as an offer, however, Helman did not accept that offer. Rather, Helman responded by promising to update social media posts to attribute the Image to Beard and include a link to his website, and "to provide [Beard] with the hardware" that Helman believed he had previously promised.[77] The offer to provide boot buttons rather than boots is a material change to the offer—and not an unconditional acceptance—and therefore constitutes "a counter-offer, which has the effect of terminating the original offer."[78] Beard then rejected Helman's counteroffer as "insult[ing]."[79]

On July 20, 2020 at 5:39 p.m. Beard again emailed Helman with what may be construed as an offer. Beard reiterated that three conditions "would be acceptable in remedy for me": (1) update all social media posts that referenced the Boot Buttons

---

[75] Doc. 13-1 at 21.
[76] *Id.* at 20-21.
[77] *Id.* at 18; *see id.* at 18-19.
[78] *Salutations, Inc.*, 2019 WL 5581538, at *4.
[79] Doc. 13-1 at 16.

to state that the Image was copyrighted by Beard and licensed by Defendants; (2) include a link to Beard's website in all such posts; and (3) provide Beard with a pair of boots that had the Boot Buttons on them.[80] Again, however, Helman did not immediately accept this possible offer. Rather, on July 21, 2020 at 2:26 p.m., Helman responded by proposing language to update any postings to note Beard's copyright and provide a link to Beard's website, and offered to have the Image turned into buckles or pins as a cross-promotion between Beard and Helman; no mention of the boots was made in that email.[81]

It is clear from Helman's email that he did not at that time unconditionally accept any alleged offer made by Beard, as he did not agree to provide Beard with boots.[82] Moreover, there is a factual dispute as to whether Helman's email constitutes a counteroffer that terminated Beard's second offer. By failing to mention the boots and instead offering to create a cross-promotion with Beard involving buckles or pins, a fact finder could reasonably conclude that Helman was offering different terms to settle the dispute, thereby terminating Beard's prior offer.

A reasonable juror could also conclude that Beard interpreted Helman's offer in such a manner. On July 21, 2020 at 8:19 p.m., Beard sent a Facebook message to

---

[80] *Id.* at 14.
[81] *Id.* at 13.
[82] *See Quiles v. Fin. Exch. Co.*, 879 A.2d 281, 285 (Pa. Super. Ct. 2005) ("So long as *any condition* is not acceded to by both parties to the contract, the dealings are mere negotiations and may be terminated at any time by either party while they are pending" (emphasis added)); *Martin v. Pa. Tpk. Comm'n*, 112 A.2d 167, 169 (Pa. 1955) (same).

16

Helman stating that, although the language regarding copyright and licensing "looks good," Helman had failed to "address the rest of [Beard's] email" and, therefore, "we're not in an agreement stage right now[,] we're just in a[n] understanding up to a certain point."[83] Beard iterated that the boots were "a deal breaker,"[84] which could be interpreted as a rejection of Helman's counteroffer. It was not until after this email that Helman, at 8:35 p.m., stated that he would accept the conditions that Beard had previously offered to settle the matter.[85]

Although Helman agreed to the three conditions originally proposed by Beard, a reasonable juror could conclude that, by then, Helman had already proposed a counteroffer that effectively terminated Beard's prior offer.[86] Had Beard's prior offer been terminated by counteroffer, Helman could not have legally accepted that offer.[87] Accordingly, there remains a genuine issue of material fact as to whether Beard and Helman entered into a settlement agreement, and summary judgment on that ground is inappropriate.[88]

---

[83]   Doc. 13-1 at 23.

[84]   *Id.*

[85]   *Id.* at 9-10, 24.

[86]   *Salutations, Inc.*, 2019 WL 5581538, at *4.

[87]   *See Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 764 A.2d 587, 593 (Pa. Super. Ct. 2000) (concluding that defendant had terminated original offer by making a counteroffer and it therefore "could [not] assent by conduct to an offer it had already expressly rejected in writing").

[88]   Beard also argues that Helman's language in allegedly attempting to accept the offer definitively demonstrates that Helman did not accept any offer. Doc. 13 at 22-23. To that end, in his July 21, 2020 email sent at 9:47 p.m., Helman wrote "I also think it would be prudent if we reduce the renegotiation of this agreement into a writing so that we do not have to have another discussion like this in 2030." Doc. 13-1 at 10. Pennsylvania courts have often noted that "[a]n arrangement of terms, *in contemplation of a written contract,* is not a perfect

## ii.    Whether Valid Consideration was Offered

Even if the evidence definitively established that there was an offer and acceptance, there remains a genuine dispute as to whether any form of valid consideration was offered to settle this dispute. It is undisputed that three items were preliminarily offered in exchange for settling Beard's claims, at least as to the use of the Image on the Boot Buttons: (1) update all of Defendants' social media postings to include the phrase "officially license artwork by Ed Beard Jr used with permission"; (2) include a link to Beard's website in all of Defendants' social media posts that reference the Boot Buttons; and (3) provide Beard with a pair of boots that included the Boot Buttons.[89]

It is well settled under Pennsylvania law "that 'performance of that which one is already legally obligated to do is not consideration sufficient to support a valid agreement.'"[90] Stated differently, "'[w]here a legal obligation exists, a cumulative promise to perform it, unless upon a new consideration, is a nullity.'"[91]

---

agreement upon which *an action can be maintained. To produce this effect, it must be shown, by the acts* or declarations *of the parties, that they intended the agreement to be operative before execution,* and without regard to the writing." *Accu-Weather, Inc. v. Thomas Broad. Co.*, 625 A.2d 75, 79 (Pa. Super. Ct. 1993) (quoting *Maitland v. Wilcox*, 17 Pa. 231, 234 (1851)). Reasonable jurors could debate whether Helman's language indicates that he intended not to the bound by the agreement prior to putting it into writing, or whether his subsequent actions indicate that he intended for the agreement to be binding regardless of whether it was ever put into writing. This too prevents the Court from granting summary judgment in favor of Defendants.

[89]   Doc. 13-1 at 14.

[90]   *Bricklayers of W. Pa. Combined Funds, Inc. v. Scott's Dev. Co.*, 90 A.3d 682, 694 (Pa. 2014) (quoting *Cohen v. Sabin,* 307 A.2d 845, 849 (Pa. 1973)).

[91]   *Id.* (quoting *In re Commonwealth Trust Co.*, 54 A.2d 649, 651 (Pa. 1947)).

Consequently, the Court must determine whether the terms of the alleged settlement agreement are new promises, or constitute mere promises to perform Defendants' preexisting legal obligations.

It is undisputed that Defendants were required to note Beard's copyright and state that the Image was used with his permission. Defendants argue, however, that providing Beard with a pair of boots was not part of the original agreement and, in any event, any legal obligation to provide said boots had lapsed, meaning that agreeing to provide Beard with boots constitutes sufficient consideration to support an agreement.[92] Defendants further contend that they were not required to provide a link to Beard's website and agreeing to provide any such link also constitutes consideration.[93]

As to the boots, there is a genuine issue of material fact regarding whether Helman agreed to provide Beard with boots as part of the original licensing agreement. In the July 2020 exchanges between Beard and Helman, Beard repeatedly expressed that, in exchange for permission to use the Image to produce goods, Helman had agreed to provide Beard with a pair of boots that featured the Boot Buttons.[94] In contrast, Helman recalled only promising "to get [Beard] a set of the hardware as soon as we had them made."[95] This raises a question as to whether

---

[92] Doc. 14 at 10-11.
[93] *Id.* at 11-12.
[94] Doc. 13-1 at 13, 16, 19, 23, 24.
[95] *Id.* at 18.

Helman was required to provide Beard with a pair of boots as part of the license. Therefore, the Court cannot conclude that agreeing to provide Beard with a pair of boots in 2020 constitutes adequate consideration to support a settlement agreement.[96]

Defendants further argue that, even if the boots were a part of the original agreement, any statute of limitations on the legal obligation to provide the boots passed long ago and, accordingly, such boots constitute consideration adequate to support the settlement agreement.[97] The Court has been unable to locate any cases addressing the situation here—that is, the right to pursue a legal obligation is allegedly barred by the applicable statute of limitations, thus rendering the original legal obligation a nullity, thereby turning a promise to perform the original terms of that agreement into adequate consideration to support a new agreement. However, the Supreme Court of Pennsylvania addressed a somewhat analogous situation well over a century ago.

---

[96] Defendants contend that Beard never required the boots as part of the original agreement, as he used the terms "request" and "favor" when referencing Helman's alleged 2008 agreement to provide Beard with boots. Doc. 14 at 11. However, Beard consistently used terms to describe the entirety of the licensing agreement. *See* Doc. 13-1 at 13-14 ("I offered to do the work to help you out, I asked in return to have [my] boots . . . replaced . . . That exchange for goods and services in this scenario at best could be looked upon as an informal contract, but I don't look at it that way, I look at this as an opportunity to make good when returning a favor"); *id.* at 16 ("I offered to [create the Image] out of the goodness of my heart . . . [and] as a small token of thanks, I asked in exchange for a pair of boots with those buttons"); *id.* at 17 ("I spent a day or more on thinking that design out . . . the least you could do is accept this as just a return favor"); *id.* at 23 ("I'm holding you to my request for the return favor 12 years ago when I did this piece of art" and "I provided you . . . a favor and in return you're doing me right by the boots"); *id.* at 24 ("it's called a 'favor for a favor' your word and a handshake is your bond"). This terminology merely raises a factual question as to whether the exchange of boots was a requirement of the licensing agreement—a question that must be answered by the fact finder in this matter.

[97] Doc. 14 at 11.

In *Murphy v. Crawford*, the Supreme Court of Pennsylvania considered whether an individual's promise to pay a judgment that had been previously discharged in bankruptcy was sufficient consideration to support an agreement.[98] That court held that, because "the effect of the certificate in bankruptcy is to extinguish the debt, not merely to bar the remedy for its recovery . . . the prior legal obligation is a sufficient consideration for a new promise to pay it."[99] The court emphasized that "it is impossible to conceive how an instrument can regain its properties once lost, except by a repetition of the solemnities from which it originally derived them, and nothing is clearer than that a promise to pay is not a new delivery" and, therefore, "a promise to pay a specialty debt, discharged by certificate in bankruptcy, does not revive the original debt, or a debt by specialty."[100] Instead, "the original debt is merely the consideration which renders the new promise available."[101]

The same logic would appear to apply to an obligation that is no longer subject to a legal remedy based upon the expiration of the applicable statute of limitations;[102] "[n]othing remains . . . but the moral obligation to" fulfill the terms of the original agreement "which, taken with the fact of the prior legal obligation, . . . form[s] a

---

[98] 7 A. 142, 142-43 (Pa. 1886).
[99] *Id.* at 142.
[100] *Id.* at 143.
[101] *Id.*
[102] *Cf. Huntingdon Fin. Corp. v. Newtown Artesian Water Co.*, 659 A.2d 1052, 1055 (Pa. Super. Ct. 1995) (noting that, where the statute of limitations to enforce a contract has lapsed, "no legal obligation exists").

sufficient consideration for a new express promise."[103] Consequently, the Court concludes that Defendants correctly assert that a promise to fulfill the terms of a contract—if that contract is no longer legally enforceable—is sufficient consideration to support a new agreement.

Nevertheless, the Court cannot conclude that, as a matter of law, the statute of limitations on any contract claim related to the boots has lapsed. Although the parties allegedly reached an agreement related to the boots in 2008, that agreement was expressly contingent on Helman creating the Boot Buttons.[104] The Boot Buttons were not successfully manufactured until 2018 at the earliest.[105] Because the conditions for the production of the required boot were not met prior to 2018, the statute of limitations would have run at some time in 2022,[106] and this 2021 lawsuit would be timely. As Beard still had a valid claim for breach of contract, Defendants were legally obligated to provide him with the boots, and offering those boots to him does not constitute new consideration sufficient to support the alleged settlement agreement.

---

[103]  *Bolton v. King*, 105 Pa. 78, 81 (1884).

[104]  *See* Doc. 13-1 at 19 (Beard stating that parties had agreement that "in exchange [for use of the Image] I will expect a pair of boot *with the buttons*" (emphasis added)).

[105]  *See* Doc. 13-1 at 18 (Helman stating "[w]e did not sit on this for 10 years. I have been actively working on this since 2008"); *id.* at 20 (Beard asserting "it looks like 10 year later in 2018 you made the announcement and finally went into production" of the Boot Button). *But see* Doc. 14-2 ¶ 22 (Helman declaration stating that in "2019, we were able to get samples of a higher quality mold. Our samples arrived early in the year, with the first batches following later in the year").

[106]  *See Steiner v. Markel*, 968 A.2d 1253, 1255 n.5 (Pa. 2009) ("The statute of limitations for a breach of contract claim is four years").

Next, Defendants contend that the requirement that they provide a link to Beard's website in all social media posts is new consideration, as the original agreement entered into in 2008 required—at most—that Beard's website address accompany any display or website and that the parties cross-promote each other's businesses.[107] The Court again concludes that a genuine issue of material fact prevents it from finding that, as a matter of law, this constitutes consideration.

First, it is not clear that providing a link to Beard's website is any different from the requirement in 2008 that Beard's website address must accompany any display or advertisement involving the Boot Buttons. Obviously, while social media was in its infancy in 2008 and Helman contends he was not engaged with social media at that time,[108] even in 2008 placing a URL address on a website would have resulted in the creation of a hyperlink that would send visitors to the website, had they clicked on that address. While links to Beard's site may be placed in more locations today than in 2008, the basic scope of that requirement appears unchanged.

Second, the requirement that the parties engage in "future cross promotion"[109] may be broad enough to encompass placing a link to Beard's website in any places where Defendants advertised the sale of items that incorporate the Image. A genuine issue of material fact therefore exists as to whether that condition was within the scope of what the parties contemplated in 2008, and the Court cannot conclude that,

---

[107] Doc. 14 at 11-12.
[108] Doc. 14-2 ¶¶ 12, 28.
[109] Doc. 13-1 at 16.

as a matter of law, the requirement that Defendants provide such a link is consideration that may support the settlement agreement that was allegedly reached in 2020.[110]

### 2.   Whether Beard may Seek Statutory Damages and Attorneys' Fees

Defendants next argue that Beard's claim for statutory damages and attorneys' fees under copyright law are barred, as any alleged infringement began prior to registration of Beard's copyright.[111] Beard responds that his claim for statutory damages and attorneys' fee may proceed, as the Image is a work of visual art that is exempt, pursuant to the Visual Artists' Rights Act ("VARA"),[112] from the registration requirement upon which Defendants rely.[113]

Title 17 of the United States Code at Section 412 provides that, with limited exceptions, there shall be "no award of statutory damages or of attorney's fees" for "any infringement of copyright in an unpublished work commenced before the effective date of its registration" or "any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless

---

[110] Beard also argues—in conclusory fashion—that any purported settlement agreement would apply only to Helman, and not to the corporate defendants. Doc. 13 at 21. It is beyond peradventure that "that an agreement cannot legally bind persons who are not parties thereto." *Mandler*, 247 A.3d at 114 (brackets and internal quotation marks omitted). Because the Court cannot conclusively determine whether a settlement agreement exists at all—and such a determination must be left to the ultimate fact finder—it will not at this time address the question of which parties may have been a part of that alleged agreement.

[111] Doc. 7 at 10-22; Doc. 9 at 7-12.

[112] 17 U.S.C. § 106A(a).

[113] Doc. 13 at 27-31.

such registration is made within three months after the first publication of the work."[114] Importantly, several courts of appeal have held "that infringement 'commences' for the purposes of § 412 when the first act in a series of acts constituting continuing infringement occurs" such that "§ 412 bars an award of statutory damages for post-registration infringements when the initial act of infringement occurred prior to the effective copyright registration date."[115]

Nevertheless, Section 412 provides an exception to the general rule prohibiting recovery of statutory damages and attorneys' fees for pre-registration infringement, and permits such recovery "for a violation of the rights of the author under" VARA.[116] Section 106A of VARA in turn relates to any "work of visual art,"[117] which is defined as art, including paintings, drawings, prints, sculptures, or still photographic images that exist "in a single copy, [or] in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author."[118] A work of visual art does not include, *inter alia*, "any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container."[119]

---

[114] 17 U.S.C. § 412.

[115] *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 700-01 (9th Cir. 2008). *See also Bouchat v. Bon-Ton Dep't Stores, Inc.*, 506 F.3d 315, 330 (4th Cir. 2007); *Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 158 (2d Cir. 2007); *Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998); *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 144 (5th Cir. 1992).

[116] 17 U.S.C. § 412.

[117] 17 U.S.C. § 106A(a).

[118] 17 U.S.C. § 101.

[119] *Id.*

"Congress instructed courts to use common sense and generally accepted standards of the artistic community in determining whether a particular work falls within the scope of the definition of a 'work of visual art'."[120] "Protection of a work . . . will often depend . . . upon the work's objective and evident purpose," and "VARA does not protect advertising, promotional, or utilitarian works, and does not protect works for hire, regardless of their artistic merit, their medium, or their value to the artist or the market."[121] "VARA may protect a sculpture that looks like a piece of furniture, but it does not protect a piece of utilitarian furniture, whether or not it could arguably be called a sculpture."[122]

Here, Beard alleges that Defendants began infringing upon the Image as early as 2015,[123] while Beard registered the Image as a copyright on July 22, 2020.[124] Accordingly, unless the Image qualifies as a work of visual art, Beard is prohibited in this matter from obtaining statutory damages or attorneys' fees for any alleged copyright violation of the Image.

The Court concludes that the Image does not qualify as a work of visual art pursuant to Section 101. Although the Image is a single-production drawing and was signed by Beard, it was created specifically for use as a merchandising item—that

---

[120] *Pollara v. Seymour*, 344 F.3d 265, 269 (2d Cir. 2003) (brackets and internal quotation marks omitted).
[121] *Id.*
[122] *Id.*
[123] Doc. 1 ¶ 42.
[124] *Id.* ¶ 14.

item being boot buttons.[125] Because the Image was designed specifically for commercial use, it cannot qualify as a work of visual art.[126] Furthermore, the alleged copyright infringement was done in a commercial context and was used to produce clothing items; several courts have held "that VARA does not afford a right of action to plaintiff for the unauthorized reproduction of his work upon" products that are excluded from VARA's definition of a work of visual art.[127]

Because the Image was intended for use in "any merchandising item," it does not qualify as a work of visual art,[128] and therefore it is not subject to the protections of VARA. Since the Image does not enjoy VARA protections and the alleged infringement began prior to the effective date of the copyright registration, Beard

---

[125]  *See id.* ¶¶ 28-30.

[126]  *Cf. Pollara*, 344 F.3d at 269-71 (finding painted banner was not a work of visual art as it was commissioned by defendant with directions that the banner must include specific language to promote defendant's lobbying efforts); *Nat'l Ass'n For Stock Car Auto Racing, Inc. v. Scharle*, 184 F. App'x 270, 276 (3d Cir. 2006) (holding that the creation of "trophy images with the intent that they would be used and displayed by NASCAR" was not protected by VARA because they were "multiple attempts to arrive at the optimal design for the trophy" and were "technical drawings, diagrams, or models"); *Rivera v. Mendez & Co.*, 824 F. Supp. 2d 265, 268-69 (D.P.R. 2011) ("even though the reproductions of Plaintiff's works may in fact be unauthorized, the infringing uses alleged by Plaintiff do not garner the protections of either VARA or PRIPA, as these works were originally created to advertise and promote" the corporate defendant); *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 554 (S.D.N.Y. 2003) (concluding that an embroidered dragon design on a distinctive garment that was put into large-scale production did not qualify as a work of visual art).

[127]  *Berrios Nogueras v. Home Depot*, 330 F.Supp.2d 48, 51 (D.P.R. 2004). *See also Wilson v. New Palace Casino, L.L.C.*, No. 1:11CV447-HSO-JMR, 2013 WL 870350, at *6 (S.D. Miss. Mar. 7, 2013) ("Each of Defendants' alleged uses of the wahoo involved merchandising or qualified as advertising or promotional materials as described in subparagraph (A) of § 101's definition of 'work of visual art.' The plain language of § 106A(c)(3) would therefore seem to exclude these uses from VARA").

[128]  17 U.S.C. § 101.

27

may not recover statutory damages or attorneys' fees for an infringement of his copyright.[129] Consequently, Defendants' motion for summary judgment will be granted in this respect.[130]

### 3. Whether Beard has Standing to Assert a Copyright Claim

Finally, Defendants argue that Beard does not have standing to pursue a claim of copyright infringement because he gave Defendants an exclusive license for the Image, which is considered a transfer of copyright ownership, and the owner of a copyright may not infringe upon that copyright.[131] Beard responds that an exclusive license is not valid unless put into writing and, in any event, Defendants' use of the Image went beyond the scope of any license.[132]

"'To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"[133] As to the first element, "'[i]t is elementary that the lawful owner of a copyright is incapable of infringing a copyright interest that is owned by him; nor can a joint owner of a copyright sue his co-owner for infringement.'"[134] Although

---

[129] *Derek Andrew, Inc.*, 528 F.3d at 700-01.

[130] Although Beard argues that he did not register his copyright earlier because Defendants unlawfully infringed upon—and therefore did not publish—the image, Doc. 13 at 30-31, this has no bearing on whether Beard may pursue statutory damages and attorneys' fees. Nothing prevented Beard from registering his copyright at an earlier date, and it is his failure to do so that resulted in the infringement occurring prior to registration.

[131] Doc. 7 at 13-14.

[132] Doc. 13 at 34-37.

[133] *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 67 (3d Cir. 2018) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

[134] *Marino v. Usher*, 673 F. App'x 125, 127 n.2 (3d Cir. 2016) (quoting *Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984)).

ownership generally remains with the party who registers the copyright, where that individual provides another with an "exclusive license," such a license is considered a transfer of the copyright ownership to the party that receives the license.[135]

The parties dispute whether a valid exclusive license was granted by Beard to Defendants, as the license was granted orally. The general rule, as set forth in 17 U.S.C. § 204(a), is that "[e]xclusive licenses must . . . be in writing" to be valid.[136] However, the United States Court of Appeals for the Third Circuit has concluded that "it is perfectly reasonable to read § 204(a) as allowing enforcement of oral agreements through the same sorts of later-drafted, informal writings that are universally held to satisfy the statute of frauds in the contract setting."[137] Here, it is undisputed that Beard granted Helman an oral license in 2008,[138] and that license

---

[135] 17 U.S.C. § 101. *See also MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 778 (3d Cir. 1991) ("The owner of a copyright can transfer ownership of the copyright by selling it or by exclusively licensing it").

[136] *MacLean Assocs., Inc.*, 952 F.2d at 778.

[137] *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 829 (3d Cir. 2011). *See also Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1156 (9th Cir. 2010) ("an earlier oral assignment can be confirmed later in a writing"); *Davis v. Blige*, 505 F.3d 90, 108 (2d Cir. 2007) (oral exclusive license is valid if "later confirmed in writing"); *Lyrick Studios, Inc. v. Big Idea Prods., Inc.*, 420 F.3d 388, 392 (5th Cir. 2005) ("An after-the-fact writing can validate an agreement from the date of its inception, at least against challenges to the agreement by third parties"); *Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 591 (7th Cir. 2003) ("As [§ 204(a)] indicates, an oral assignment may be confirmed later in writing"); *Imperial Residential Design, Inc. v. Palms Development Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995) ("a copyright owner's later execution of a writing which confirms an earlier oral agreement validates the transfer ab initio").

[138] Doc. 1 ¶¶ 30-31.

*may* have been exclusive.[139] In 2020, both parties confirmed the existence of that license in writing during their email exchanges.[140]

These facts may be sufficient to establish a valid exclusive license for Helman to use the Image, as the oral license was later confirmed in writing.[141] However, there remains a genuine dispute of material fact as to whether the license was in fact exclusive. Although Beard did state that he had granted Helman "exclusivity on the use of the [Image] and my art on your boot buttons,"[142] it is not entirely clear that Beard—who is not a lawyer—meant to use the word "exclusive" in a legal sense. There is simply no information in the current record to indicate that either party intended for Helman to have an exclusive right to use the Image and, therefore, the Court cannot conclude as a matter of law that Beard lacks standing to pursue a claim of copyright infringement against Defendants.

---

[139] Doc. 13-1 at 17 (Beard writing to Helman "I offered to grant you exclusivity on the use of the design and my art on your boot buttons"); *id.* at 14 (email from Beard to Helman stating "To answer your question to what extent this was business: you don't give someone an exclusive right to an image in writing to create and exclusive license and think the recipient will not think that it's a semi formal agreement").

[140] *See* Doc. 13-1 at 17-18 (Helman acknowledging that Beard "took the time to produce a specific licensing for us to use this solely for our footwear products"); *id.* at 16 (Beard stating "you acknowledge '[that I] took the time to produce a specific licensing for us to use this solely for our footwear products'"); *id.* at 17 (Beard stating "I offered to grant you exclusivity on the use of the design and my art on your boot buttons").

[141] Beard also argues that he never extended any license to the corporate defendants but, rather, gave the license only to Helman. Doc. 8 at 23. Because the Court concludes that summary judgment is inappropriate on other grounds, it declines to address this issue—which is fact intensive and better resolved after discovery—at this time.

[142] Doc. 13-1 at 17.

Furthermore, there is a genuine dispute as to the scope of any license and, therefore, whether Defendants exceeded the scope of the license. Both Beard and Helman at various times refer to the license as applying "solely [to Helman's] footwear products" or boot buttons.[143] However, Defendants assert that their "belief is currently, and has always been . . . , that Defendants received a license to use the [Image] broadly on their products,"[144] and there are indications within the July 2020 communications that the parties contemplated that the Image would be used for purposes other than boot buttons.

For example, Helman states at one point that he and Beard had discussed turning the Image into "pins or something that might be more commercially appealing for [Beard's] customers,"[145] while Beard stated that he "was hopeful [that they could create] hat pins or belt buckles[,] etc." that featured the Image,[146] and implicitly acknowledged that he understood the Image would be used for items other than boot buttons.[147] If the license applied only to boot buttons, not only would it not have been exclusive,[148] but Defendants would have exceeded the scope of that license by using the Image in other products.

---

[143] *Id.* at 18 (statement by Helman). *See also id.* at 17 (email from Beard stating "I offered to grant you exclusivity on the use of the design and my art on your boot buttons").

[144] Doc. 14-1 ¶ 4.

[145] Doc. 13-1 at 18.

[146] *Id.* at 17.

[147] *See id.* at 19 (Beard stating in email to Helman that their original agreement was that Helman could use the Image for his products and "in exchange I will expect a pair of boots with the buttons and any other item that you use the buttons on").

[148] *See Allscripts Healthcare, LLC v. Andor Health, LLC*, No. CV 21-704, 2021 WL 7209357, at *5 (D. Del. Nov. 22, 2021) (noting that, in contrast to an exclusive license, a nonexclusive

In sum, there remain factual disputes as to whether Beard granted Defendants an exclusive license and whether Defendants exceeded the scope of any such license. The Court therefore cannot conclusively determine that Defendants received an exclusive license that would bar Beard from pursuing a copyright claim against Defendants, and their motion for summary judgment will be denied in that respect.[149]

## III.  CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment is granted in part. Judgment will be entered in favor of Defendants as to Beard's request for statutory damages and attorneys' fees. The motion is denied in all other respects.

An appropriate Order follows.


BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

license "gives the licensee a right to use, make, or sell the licensed item on a shared basis with the licensor and possibly other licensees" and "is a mere waiver of the right to sue for infringement" (internal quotation marks omitted)).

[149]  Defendants also request that if the Court dismisses Beard's copyright claim, it decline to exercise supplemental jurisdiction over Beard's state law breach of contract claim. Doc. 7 at 15. Because the Court will not at this stage dismiss Beard's copyright claim, it will continue to exercise supplemental jurisdiction over Beard's breach of contract claim.