# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EDWARD P. BEARD, JR.,

      Plaintiff,

      v.

ARIK HELMAN *et al.*,

      Defendants.

No. 4:21-CV-00680

(Chief Judge Brann)

## MEMORANDUM OPINION

### MARCH 6, 2024

The fiery dispute in this case came on the heels of a disagreement about dragon-themed boot buttons. At summary judgment, the parties dispute whether they entered into a settlement agreement extinguishing the plaintiff's claims, and whether the dragon boot buttons are a jointly authored work under copyright law. I find that disputes of fact continue to preclude any finding that a settlement agreement was reached between the parties. Furthermore, while there is no dispute of fact that the dragon boot buttons are a joint work, the defendants' simplified, two-dimensional rendering of plaintiff's design is not.

## I.    BACKGROUND

In April 2021, Edward P. Beard, Jr., filed a complaint against Arik Helman, Son of Sandlar, Son of Sandlar LLC, Sandlar Manufacturing, and Twisted World LLC ("Defendants") for Direct Copyright Infringement, Contributory Copyright

Infringement, and Vicarious Infringement.[1] Beard also sued Helman for breach of contract.[2] In June 2021, Defendants filed a motion to dismiss,[3] which was later converted to a motion for summary judgment.[4] In March 2022, this Court granted that motion with respect to Beard's request for statutory damages and attorneys' fees under the Copyright Act, but denied it in all other respects.[5] Defendants filed an answer and counterclaim against Beard in April 2022, seeking a declaratory judgment and suing for breach of contract.[6] Beard filed his answer to Defendants' counterclaims in June 2022.[7]

In September 2023, Defendants filed two motions for summary judgment, one on the issue of settlement and one on the issue of joint authorship.[8] The motions are now ripe for disposition. For the reasons stated below, the motion for summary judgment on the issue of settlement is denied. The motion for summary judgment on the issue of joint authorship is granted in part and denied in part.

---

[1]    Complaint, Doc. 1.
[2]    *Id.*
[3]    Defendants' Motion for Summary Judgment, Doc. 6.
[4]    Order, Doc. 10.
[5]    Order, Doc. 17.
[6]    Defendants' Answer and Counterclaims, Doc. 18.
[7]    Plaintiff's Answer to Counterclaims, Doc. 19.
[8]    Motion for Summary Judgment on the Issue of Joint Authorship, Doc. 33; Motion for Summary Judgment on the Issue of Settlement, Doc. 35.

## II.   DISCUSSION

### A.   Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[9] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[10] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[11] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[12]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[13] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[14] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by

---

[9]   Fed. R. Civ. P. 56(a).
[10]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).
[11]   *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).
[12]   *Id.*
[13]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).
[14]   *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[15] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[16]

Middle District of Pennsylvania Local Rule 56.1 governs summary judgment and is designed to "structure a party's summary judgment legal and factual theory into a format that permits and facilitates the court's direct and accurate consideration of the motion."[17] The Rule provides:

> A motion for summary judgment filed pursuant to Fed.R.Civ.P.56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried. The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried. Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.[18]

---

[15] Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[16] Fed. R. Civ. P. 56(c)(3).

[17] *Savidge v. Donahoe*, No. 3:08-CV-2123, 2011 U.S. Dist. LEXIS 89894, at *5 (M.D. Pa. Aug. 12, 2011) (quoting *Hartshorn v. Throop Borough*, No. 3:07-CV-01333, 2009 U.S. Dist. LEXIS 22372, at *3 (M.D. Pa. Mar. 19, 2009)).

[18] M.D. Pa. L.R. 56.1.

"[T]he proper sanction for violating Rule 56.1 is within the district court's discretion."[19]  Where nonmovants fail to support denials with record citations, a common sanction is to deem these allegations admitted.[20] In this case, all of Beard's denials are bereft of citation. And rather than stating the basis for his denials with any specificity, Beard replies to nearly all of Defendants' allegations by stating that the record "speaks for itself,"[21] which is noncompliant with Rule 56.1.

Courts have characterized the much-maligned speaks-for-itself denial as an "unacceptable device, used by lawyers who would prefer not to admit something that is alleged about a document in a complaint (or who may perhaps be too lazy to craft an appropriate response to such an allegation)."[22] As I recently noted, "the failure to point to support in the record itself is often a tacit admission that the record does not create a dispute of material fact."[23] Where unsupported by any "additional facts," such denials become toothless. So long as Defendants' factual assertions are supported by their record citations, I will deem these facts admitted.

---

[19]  *Hickley v. Merritt-Scully*, No. 4:18-cv-01793, 2021 U.S. Dist. LEXIS 46550, at *2 (M.D. Pa. Mar. 12, 2021) (Schwab, M.J.) (citing *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 614 (3d Cir. 2018)).

[20]  *See Smith v. Addy*, 343 F.App'x 806, 808 (3d Cir. 2009).

[21]  Statement of Facts re: Motion for Summary Judgment on Issue of Joint Authorship ("Joint Authorship SOF"), Doc. 42 ¶¶ 4, 6-8, 10-16; Statement of Facts re: Motion for Summary Judgment on Issue of Settlement ("Settlement SOF"), Doc. 44, ¶¶ 4, 6-8, 10-16 ("Mr. Beard's [Affidavit or Deposition Transcript] is a matter of record which speaks for itself and any selective quotation or characterization thereof by Defendants is specifically denied.").

[22]  *State Farm Mut. Auto Ins. Co. v. Riley*, 199 F.R.D. 276, 279 (N.D. Ill. 2001).

[23]  *Webb v. Columbia Cnty*, No. 4:22-CV-00292, 2023 U.S. Dist. LEXIS 230328, at *6 (M.D. Pa. Dec. 27, 2023).

Additionally, although the Local Rules do not permit "statements of additional facts," I will also consider Beard's "additional facts" to the extent that they are helpful and supported by record citations.

### B.   Statement of Facts

### 1.   The Design

What began as a friendly collaboration between vendors at a Renaissance Faire eventually led to a dispute over the execution of their project. Edward Beard, Jr. is a well-regarded fantasy artist who sells his work at Renaissance Festivals.[24] Arik Helman owns and operates a business that sells boots, clothing, and other leather goods at Renaissance Festivals.[25] Son of Sandlar, LLC is the retail arm of Helman's business, while Sandlar Manufacturing, LLC produces items for the business.[26] Son of Sandlar, Inc., and Twisted World, LLC are also parties to the suit.[27] Helman is the sole member and officer of the corporate defendants in this case.[28]

At the 2008 Florida Renaissance Faire, Beard and Helman had adjacent booths.[29] The two had friendly conversations as the Faire went on, and Helman

---

[24]   Beard Aff., Doc. 34-5 ¶¶3-4.

[25]   Brief in Support of Defendants' Motion for Summary Judgment on Issue of Joint Authorship, Doc. 34 ¶1; Plaintiff's Joint Authorship SOF, Doc. 42 ¶1.

[26]   Brief in Support of Defendants' Motion for Summary Judgment on Issue of Joint Authorship, Doc. 34 ¶¶2-3.

[27]   Complaint, Doc. 1.

[28]   Brief in Support of Defendants' Motion for Summary Judgment on Issue of Joint Authorship, Doc. 34 ¶5.

[29]   Helman Dep., Doc. 34-1 at 35-36: 1-20; Beard Dep., Doc. 34-2 at 119-120: 23-7.

described an issue he was having designing a circular, dragon-themed button for his boots.[30] Beard had considerable experience with circular dragon designs, and was penning several such designs for a coloring book at the time.[31] Following the conversation about Helman's design challenges, Beard indicated that he would get back to Helman, and later worked on the boot button design himself.[32] He presented the finished design (the "Original Design") in the form of a 2-D drawing to Helman during the following show weekend as a "surprise:"[33]



---

[30]  Beard Aff., Doc. 34-5 ¶¶ 7-9.
[31]  Plaintiff's Joint Authorship SOF, Doc. 42 ¶¶19-20, 22; Beard Dep., Doc. 34-2 at 121:9-24.
[32]  Beard Dep., Doc. 34-2 at 122:1-13.
[33]  Beard Aff., Doc. 34-5 at ¶¶ 7-9; Beard Dep., Doc. 34-2 at 122:8-13; Beard Aff., Doc. 34-3 at 6.

Helman "immediately loved the concept art," and agreed that it was ideal for his purposes.[34]

While the parties agree that Beard and Helman then made an oral licensing agreement for the buttons, they disagree as to that license's terms.[35] Beard contends that the design was "strictly for boot buttons," stating: "I even itemized on the drawing itself for him. So it says boot buttons, you know, this is dragon boot button. That's not by accident. That's because it was intended just for that. And there was no confusion in the way I presented it. I said it very specific."[36] Helman believed that his license for the design had not been limited to buttons, and that they had had only "general conversations" on the topic.[37] Helman's recollection was that Beard wanted the design to be used only for Son of Sandlar's products, and to ensure that other parties did not infringe on it, not that it would be limited solely to buttons.[38]

After receiving Beard's design, Helman began the process of turning it into a three-dimensional boot button. Because of the limitations of metal forgery, Beard's drawing could not be perfectly reproduced; instead, parts of it had to be modified.[39] Helman worked through contractors in Mexico, who he engaged to refine the

---

[34]  Helman Decl., Doc. 34-4 ¶9.
[35]  Doc. 34, ¶9; Doc. 42, Plaintiff's Joint Authorship SOF ¶9.
[36]  Brief in Support of Defendants' Motion for Summary Judgment on Issue of Joint Authorship, Doc. 34 ¶10; Plaintiff's Joint Authorship SOF, Doc. 42 ¶10; Beard Dep., Doc. 34-2 at 127: 14-20.
[37]  Helman Dep., Doc. 34-1 at 55-60, 204:14-21.
[38]  *Id.*
[39]  Helman Dep., Doc. 34-1, at 102:5-25.

design.[40] Helman rejected over 15 or 20 models offered by the Mexican contractors, offering various refinements on the button's appearance such as giving the design more negative space or adjusting the size of the head.[41]

Beard followed up with Helman at Renaissance Faires several times after 2008 to request updates on the boot button,[42] but the two fell out of touch. Eventually, Helman received a simplified rendering of the boot button which he was both satisfied with, and which could actually be reproduced in metal (the "Simplified Design"):[43]



---

40 Brief in Support of Defendants' Motion for Summary Judgment on Issue of Joint Authorship, Doc. 34 ¶11; Plaintiff's Joint Authorship SOF, Doc. 42 ¶11.
41 Brief in Support of Defendants' Motion for Summary Judgment on Issue of Joint Authorship, Doc. 34 ¶12; Helman Dep., Doc. 34-1 at 66:18-21, 185:18-25–186:1-3.
42 Beard Dep., Doc. 34-2 at 129:14-16.
43 Helman Dep., Doc. 34-5 ¶¶ 23, 31; Beard Aff., Doc. 34-3 at 6.

Helman was then able to forge three-dimensional boot buttons based on this Simplified Design:[44]



### 2.     The Dispute

Before the button's metalwork was finished, but after the Simplified Design was created, Helman began implementing the design into other products, mainly through leather appliques.[45] Beard states that Helman did so "at least as far back as 2015," while Helman agrees that he has been producing appliques "going back to at least 2012."[46] Helman contends that while he could have copied the Original Design exactly, he used the Simplified Design for these items because he wanted

---

[44]   Complaint, Doc. 1 at 11.
[45]   *Id.* ¶22-23.
[46]   Helman Dep., Doc. 34-1 at 203:11-16; Beard Dep., Doc. 34-2 at 200:14-24; Doc. 34-5 ¶23.

his full inventory of items to share an identical design.[47] He began selling the finished buttons in 2018.[48] Helman never contacted Beard before making any of these marketing decisions.[49]

In July 2020, Beard was contacted by a friend who recognized Beard's distinctive art style in the Simplified Design, as used in one of Helman's buttons.[50] Beard then contacted Helman, accusing him of breach of the licensing agreement and infringement of his copyrights in the dragon boot button design.[51] Beard was incensed that Helman had not contacted him before beginning production or credited him in Helman's social media posts, as Beard believed was required under the licensing agreement.[52] While Beard stated that he was "pissed" and "would rather just simply file lawsuit against [Helman]," his "attorney sa[id] that taking the highroad would be the first line of action at this time and to give you the opportunity to do the right thing."[53]

Beard's email started a series of communications, through email and Facebook Messenger, which Helman alleges resulted in a settlement of Beard's claims. After a rather tense exchange on Facebook Messenger,[54] Helman responded to Beard's email that he had taken the design "to be meant as a gesture

---

[47]   Helman Dep., Doc. 34-1 at 74:17—76:1.
[48]   Helman Dep., Doc. 34-2 at 203:1—204:4.
[49]   Helman Dep., Doc. 34-1 at 165:20-22; Beard Dep., Doc. 34-2 at 172:9-24.
[50]   Beard Aff., Doc. 34-5 ¶16; Beard Dep., Doc. 34-2 at 110:6-21.
[51]   Beard Aff., Doc. 34-5 ¶¶ 15-17.
[52]   Helman and Beard 2020 Correspondence by Chronology, Doc. 34-3 at 3.
[53]   *Id.*
[54]   *Id.* at 6-7.

of friendship and never intended as some transactional arrangement."[55] Nevertheless, Helman stated that the failure to keep in contact and accredit Beard's work was "entirely my fault," and expressed a desire to remedy Beard's complaints.[56] Beard responded, continuing to state his complaints with Helman's conduct.[57] Helman indicated in his reply that he was amenable to the manner in which Beard would like to move forward with the product.[58]

On July 20, 2020, Beard responded with the following request:

1. Update all of your current postings with the phrase 'officially licensed artwork by Ed Beard Jr' used with permission. 2. A link to my website where ever you have posted . . . 3. To set me up for a pair of boots that actually fit me adorned with these Dragon buttons of my illustration. Thats [sic] it Arik.[59]

Helman responded to Beard's email the next day, on July 21.[60] "I will send you a second more lengthy email that addresses the personal issues. To address the immediate issue I will certainly update all the web postings . . . . If you want me to start the process of having these made as buckles or pins, we can certainly begin that process."[61]

Beard was not pleased that Helman's response did not address his request for new boots. Beard stated that they were "not in an agreement stage," and that

---

[55] *Id.* at 8.
[56] *Id.*
[57] *Id.* at 10-11.
[58] *Id.* at 13.
[59] *Id.* at 15-16.
[60] *Id.* at 18.
[61] *Id.*

Helman's agreement to send him new boots was a "deal breaker."[62] "I'm not gonna back down off of this."[63] Helman responded tersely:

> If you want to reclassify this as a transactional deal, I understand. I had other hopes for greater ideas. But at this point I'd rather just forget about it. Please let me know the size you would like. Confirm the exact writing you would like to appear [for accreditation] and we can conclude this transaction.[64]

Beard was not pleased by this response, either. He responded via messenger that the settlement was "Not going to happen. It doesn't work that way. This is not a reclassification no matter how you try to spin it. It's called a 'favor for a favor' your word and a handshake is your bond."[65] Beard called off any possibility of a deal:

> Unless you can provide proof that I was compensated for the exclusive license rights defined to you, then you have no rights to use the art and will need to stop all production and sale until you provide an accounting of sales and we create this 'business agreement' you insist we now have . . . . My attorney will be in touch.[66]

At this point, it was clear that a settlement deal was off the table. Helman responded with frustration,[67] and Beard responded with a cease-and-desist notice.[68]

At the time of these communications, Beard was unaware that the Simplified Design had been used on other products.[69] As Beard contends that the oral

---

[62] *Id.* at 19.
[63] *Id.*
[64] *Id.* at 21.
[65] *Id.* at 23.
[66] *Id.* at 23-24.
[67] *Id.* at 24.
[68] *Id.* at 25-26.

agreement only authorized use of his design on boot buttons, he considered this too to be a breach of that agreement, one which Helman concealed from him during this conversation.[70]

## III.   ANALYSIS

Defendants file two motions for summary judgment. One seeks summary judgment on the issue of settlement;[71] the other seeks summary judgment on the issue of joint authorship.[72]

### A.   Settlement

This Court's March 2022 Memorandum Opinion denied Defendants' motion for summary judgment on the issue of settlement. I concluded that "a close reading of the email and Facebook message exchanges between Beard and Helman in July 2020 demonstrates that a genuine issue of material fact remains as to whether the parties reached a binding settlement agreement."[73] Despite Defendants' protests otherwise, that fact has not changed since. As the record has not altered the groundwork for most of these arguments, they require minimal additional analysis.

Under Pennsylvania law, "settlement agreements are governed by the same rules of law as . . . contracts."[74] "To be enforceable, a settlement agreement must

---

[69]   Beard Aff., Doc. 34-5 ¶22.
[70]   Beard Aff., Doc. 34-5 ¶28.
[71]   Motion for Summary Judgment on the Issue of Settlement, Doc. 35.
[72]   Motion for Summary Judgment on the Issue of Joint Authorship, Doc. 33.
[73]   Memorandum Opinion, Doc. 16 at 14.
[74]   *Adams v. Adams*, 848 A.2d 991, 993 (Pa. Super. Ct. 2004).

possess all the elements of a valid contract—offer, acceptance, and consideration or a meeting of the minds."[75]

As with Defendants' last motion for summary judgment, the issue is offer and acceptance. "To constitute a binding contract, there must be an unconditional acceptance . . . identical with the terms of the offer, without qualification or condition."[76] "When we determine whether parties have manifested an intent to be bound, we 'consider "not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior.'"[77]

### 1.    Helman's 2:26 P.M. Email

Defendants first contend that Helman never rejected Beard's purported email offer[78] when Helman responded in his 2:26 P.M. email on July 21, 2020.[79] When deciding upon Defendants' last summary judgment motion, this Court already held:

> It is clear from Helman's email that he did not at that time unconditionally accept any alleged offer made by Beard, as he did not

---

[75]  *Baribault v. Zoning Hearing Bd. of Haverford Twp.*, 236 A.3d 112, 118 (Pa. Commw. Ct. 2020) (citing *Muhammad v. Strassburger, McKenna, Messer, Shilobod & Gutnick*, 587 A.2d 1346, 1349 (Pa. 1991)).

[76]  *501 Mgmt. Grp. v. Khayat*, No. 3318 EDA 2011, 2013 Pa. Super. Unpub. LEXIS 2830, at *18 (Pa. Super. Ct. Nov. 4, 2013).

[77]  *DiDonato v. U.S. Legal Support, Inc.*, No. 15-6035, 2017 U.S. Dist. LEXIS 131224, at *11 (E.D. Pa. Aug. 17, 2017) (quoting *Baldwin v. Univ. of Pitt. Med. Ctr.*, 636 F.3d 69, 75 (3d Cir. 2011)).

[78]  This Court never ruled that Beard made any offer to settle in the first place, and it does not do so here.

[79]  Helman and Beard 2020 Correspondence by Chronology Doc. 34-3 at 10.

agree to provide Beard with boots. Moreover, there is a factual dispute as to whether Helman's email constitutes a counteroffer that terminated Beard's second offer.[80]

No new information in the record challenges either finding.

Notably, Helman's email response only explicitly accepted two terms of Beard's purported offer, and never addressed whether he would provide Beard with new boots. Defendants now point to Helman's deposition testimony, in which Helman states that he had planned to address Beard's request for boots in the "more lengthy email that addresses the personal issues" Helman referenced.[81] But all this does is show Helman's subjective intention when sending this email; it does not make that intention objectively apparent.

Defendants protest that "Helman clearly states that further communication regarding the offer is coming."[82] But further communication on "personal issues" hardly clarifies to the offeror of a settlement agreement that an outstanding term of the offer will be addressed. A reasonable person would struggle to puzzle out Helman's intention based on the full context of Helman's reference to this personal email, which indicates only that Helman's would informally address his and Beard's spat: "I have a few things I wanted to address with you for the sake of friendship and transparency. But I would like to address the more immediate issues

---

[80]   Memorandum Opinion, Doc. 16 at 16.
[81]   Defendants' Brief in Support of its Motion for Summary Judgment on the Issue of Settlement, Doc. 36 at 10.
[82]   *Id.*

clearly and quickly. I will send you a second more lengthy email that addresses the personal issues."[83] Helman's true intentions aside, there is nothing now in the record requiring this Court to revisit its earlier ruling that Helman's email can be interpreted as a counteroffer.

### 2.    Beard's 8:19 P.M. Facebook Message

Next, defendants argue that Beard's 8:19 P.M. Facebook message renewed his purported prior offer, so long as Helman agreed to provide the boots. Beard's message is quite lengthy, but in relevant part, it reads as follows:

> Just read your first email. Regarding copyright and licensing etc
>
> All looks good on that assuming you address the rest of my email
>
> So don't get ahead of yourself on this we're not in an agreement stage right now we're just in a understanding up to a certain point . . .
>
> The only issue left that [I] see is a deal and honestly one that shouldn't have to even ask you to take care of it should be offered freely and willingly
>
> It[']s a deal breaker th[i]nk you know what it is so let's get to it . . . .
>
> Then comes 2008 and we begin this arrangement to which I said to you "when it all works out and you actually get to producing these boot buttons as a favor to me and of course you backing your product as well, would be that when you make me a pair of boots that fit me properly you put the new buttons on . . .
>
> So please if you don't want to back your product and don't want to comply with my request that I asked 12 years ago as a favor and

---

[83]   Helman and Beard 2020 Correspondence by Chronology, Doc. 34-3 at 18.

exchange (which really isn't a favor since the boots failed to break in) just say it.[84]

Defendants contend that, based on Beard's deposition testimony, Beard too perceived and intended his message as an offer to settle. Defendants point to the following testimony, in which Beard explains his reaction to Helman's response:

> So I'm reading this. It says: Don't worry about the second e-mail. If you want to reclassify this as a transaction deal, I understand. So that crucial sentence right there is what terminated any potential resolution here. He was trying to reclassify this as something other than what I have already defined it to be. I was not going to have that. I wasn't go[ing] to play any games. I wasn't going to allow him to put his heels down and insist that by my getting a pair of boots, somehow this would convert everything that we did into some other form of legal structure on a contract. And so right then and there – I made it very clear in my follow-up response you're not going to reclassify this. So no, we did not have an agreement at that point.[85]

Defendants read Beard's testimony as confirming that Beard made a legitimate offer to Helman, which he attempted to revoke due to the terseness of Helman's response rather than the sufficiency of his acceptance—which of course, has no relevance to Beard's offer.

Beard's testimony can certainly be read this way. But this testimony must be read in the manner most favorable to the non-moving party. And Beard's reference to "terminat[ing] any potential resolution" due to Helman's response is also consistent with his understanding that, had Helman responded differently, Beard may have been amenable to extending another offer to settle. In other words, Beard

---

[84]   *Id.* at 19-21.
[85]   Beard Dep., Doc. 33-2 at 179:22 – 180:15.

was raising the issue of the boots in his message not to renew any prior offer,[86] but simply as part of their negotiations, to determine whether he would renew his purported offer to settle. This is supported by Beard's statement near the opening of his message that "we're not in an agreement stage right now."[87] While this is not the only reading of Beard's message, it certainly creates an issue of fact.

### 3.    Helman's 8:35 P.M. Reply

Even if Beard's message can only be construed as a renewal of his prior offer, Helman's acceptance through Facebook Messenger[88] was not effective because Beard indicated that Helman must reply by email. "The offeror is the master of the offer and the offeror can limit the means of acceptance."[89]  Beard's 8:19 P.M. message indicates that he expects an email response three times: "I look forward to the rest of your email that will hopefully address the rest of my concerns for how I've been treated on this whole thing . . . I look forward to seeing your email I'll be checking later tonight . . . Ill [sic] check email late tonight."[90] The course of dealings also supports that Beard would not receive acceptance via

---

[86]   Again, this Court never ruled that Beard made a prior offer, but there is an issue of fact as to whether Beard's message was a renewal even assuming this to be true.

[87]   Helman and Beard 2020 Correspondence by Chronology, Doc. 34-3 at 19.

[88]   *Id.* at 21.

[89]   *Davison Design & Dev., Inc. v. Frison*, No. 2:17-cv-01468, 2018 U.S. Dist. LEXIS 204511, at *21 (W.D. Pa. Dec. 4, 2018), *aff'd*, No. 19-2045, 815 F.App'x 659 (3d Cir. Aug. 11, 2020) (citing *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 739 A.2d 133, 136-38 (Pa. 1999)); *Van Schoiack v. U.S. Liab. Ins. Co.*, 133 A.2d 509, 514 (Pa. 1957) ("It is settled law that the offeror is master of the offer, and his provision as to time, place and manner or mode of acceptance.").

[90]   Helman and Beard 2020 Correspondence by Chronology, Doc. 34-3 at 19-21.

Facebook Messenger. When Helman sent the first Facebook message to Beard requesting to talk over the phone, Beard responded: "Arik at this point you need to [r]espond in writing to the e-mail. We can take it from there."[91] Beard continued to insist on an email response in his next message.[92] And all the purported offers prior to Beard's 8:19 P.M. message were delivered through email, not Facebook Messenger.[93] So based on both the course of dealings and Beard's explicit requests for an email reply in his Facebook message, any offer contained therein could only be accepted through email.

Because there remains a genuine issue of material fact as to whether the parties agreed to settle this dispute, Beard's motion for summary judgment is denied.

### B.    Joint Authorship

Defendants' brief also raises a new joint authorship defense. Beard first contends that Defendants have waived this defense, and then contests the merits. As explained below, because joint authorship is a general rather than an affirmative defense to copyright infringement, Defendants have not waived it by failing to include it in their first responsive pleading. Moreover, there is no genuine issue of material fact that the dragon boot buttons are a joint work. However, Helman is not

---

[91]   *Id.* at 6.

[92]   *Id.* at 6-7 ("There has been no email from you as of this morning 11:57 AM . . . If you would prefer not to reply to the email we can argue in court.").

[93]   This also further supports the assertion that Beard intended his Facebook message as part of his negotiations, and not as a renewal of his offer.

a joint author of his Simplified Design. Defendants' motion for summary judgment is therefore granted in part and denied in part.

### 1.   Waiver

Federal Rule of Civil Procedure 8(c) states that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense," including eighteen specified examples of affirmative defenses. "Failure to raise an affirmative defense by responsive pleading or by appropriate motion generally results in waiver of that defense."[94] In contrast, failing to plead a general defense[95] does not result in waiver. Yet "Rule 8(c) does not elaborate on how to determine what is covered by this catchall statement and thus it offers very little assistance."[96] Here, Defendants have raised a joint authorship defense for the first time in their motion for summary judgment. Accordingly, Beard contends that joint authorship is an affirmative defense subject to waiver, while Defendants assert that joint authorship is a general defense which can be raised at any time.

The parties pose a somewhat novel question. Scarce authority has explicitly addressed whether joint authorship is an affirmative defense; this appears to be a question of much dicta and little law. It is noteworthy that scores of cases have

---

[94] *Charpentier v. Godsil. et al.*, 937 F.2d 859, 863 (3d Cir. 1991). However, "a defendant does not waive an affirmative defense if he raised the issue at a pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond." *Id.* at 864.

[95] A general defense is also referred to as a "negative defense."

[96] 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1271 (4th ed. 2023).

referred to joint authorship as an affirmative defense in unreasoned dicta.[97]

Likewise, our Court of Appeals, in an unpublished opinion, has referred to the

"implied license" defense, which also hinges upon whether a party is authorized to

use a design, as an affirmative defense, but it provided no reasoning.[98] These

decisions are of minimal persuasion because:

> [A] pleader, to avoid waiving an otherwise valid defense, often will
> decide to set up affirmatively matter that technically may not be an
> affirmative defense, as stated in defendant's briefings but nonetheless might fall within the residuary
> clause of Rule 8(c). Normally, that pleader will not be penalized for
> exercising caution in this fashion even when affirmative pleading
> proves to be unnecessary.[99]

The takeaway is that while many courts refer to joint authorship as an affirmative

defense, this is often so because the defendant has referred to joint authorship as

such in its pleadings and the affirmative defense distinction is immaterial to

---

[97] *See, e.g.*, *Foster v. Lee*, 93 F.Supp. 3d 223, 228 (S.D.N.Y. 2015) (referring to joint authorship as an affirmative defense, as stated in defendant's briefings); *J2F Prods. V. Sarrow*, No. CV 09-7000-JST (FFMx), 2011 U.S. Dist. LEXIS 161767, at *10 n.1 (C.D. Cal. Jan. 31, 2011) (referring to a "'joint authorship' affirmative defense"); *Gillespie v. AST Sportswear, Inc.*, No. 97 Civ. 1911 (PKL), 2001 U.S. Dist. LEXIS 1997, at *26 (S.D.N.Y. Feb. 22, 2001) ("As with joint authorship, the existence of a license would provide defendants with an affirmative defense to copyright infringement."); *Hiller, LLC v. Success Grp.*, No. 3:17-cv-743, 2019 U.S. Dist. LEXIS 220804, at *6 (M.D. Tenn. Aug. 28, 2019) ("The jury found that Defendants did not prove by a preponderance of the evidence the affirmative defense of joint authorship.").

[98] *See NASCAR v. Scharle*, 184 F.App'x 270, 275 (3d Cir. June 21, 2006); *see also Atkins v. Fischer*, 331 F.3d 988, 992 (D.C. Cir. 2003); *Lulirama Ltd., Inc. v. Axcess Broad. Servs.*, 128 F.3d 872, 879 (5th Cir. 1997); *CMS Software Design Sys., Inc. v. Info Designs, Inc.*, 785 F.2d 1246, 1248 (5th Cir. 1986).

[99] 5 WRIGHT & MILLER § 1271.

resolving the motion before the court.[100] Therefore, the use of the phrase "affirmative defense" to describe joint authorship does not appear to represent any consistent practice among the federal district courts.

The Western District of Wisconsin's decision in *Sullivan v. Flora, Inc.* appears to be the sole opinion providing reasoning on this issue, but even *Flora* provided little reasoning.[101] It only held that "'joint authorship' is not a classic affirmative defense that a party must plead or waive . . . it is simply evidence that supports Flora's denial in its answer to plaintiff's claim of controlling notice."[102]

I find *Flora*'s distinction unpersuasive because whether something is a "classic affirmative defense" is not decisive. "The list of eighteen affirmative defenses in Federal Rule of Civil Procedure 8(c) . . . is not intended to be exhaustive."[103] Moreover, while the United States Court of Appeals for the Seventh Circuit provided even less reasoning than the district court on appeal in *Flora*, some language in its subsequent opinion did suggest that it would have found joint

---

[100] *But see SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F.Supp. 2d 301, 314 (S.D.N.Y. 2000) (Stating explicitly, albeit with no reasoning, that "joint authorship is an affirmative defense.").

[101] *Sullivan v. Flora, Inc.*, No. 15-cv-298-wmc, 2017 U.S. Dist. LEXIS 55702, at *3-4 (W.D. Wis. Apr. 12, 2017). *See also Garza v. Everly*, 59 F.4th 876, 885 (6th Cir. 2023) (Murphy, Concurring) (arguing in a different legal context that co-authorship is entailed in an author's "claim" because "a party's authorship or ownership . . . is merely one element of a claim for copyright infringement"). While arguing that joint authorship is part of a copyright infringement "claim" is consistent with viewing it as a general rather than affirmative defense, Judge Murphy's concurrence does not explore this implication.

[102] *Id.*

[103] 5 WRIGHT & MILLER § 1271; *James v. Bock*, 549 U.S. 199, 215 (2007).

authorship to be an affirmative defense.[104] Nevertheless, as explained below, I find *Flora* to be consistent with the classic formulation of affirmative defenses articulated by our Court of Appeals, and so I hold that joint authorship is not an affirmative defense. There is therefore no need to analyze whether Helman's failure to assert joint authorship in his first responsive pleading should result in waiver.

There are varying approaches to identifying what qualifies as an affirmative defense.[105] The classical formulation of affirmative defenses, also called the "logical inference" approach,[106] reasons that "[t]he difference between a general defense and an affirmative defense is that a general defense negates an element of plaintiff's *prima facie* case, while an affirmative defense excuses the defendant's conduct even if the plaintiff is able to establish a *prima facie* case."[107] The Third

---

[104] *See Sullivan v. Flora*, 936 F.3d 562, 575 (7th Cir. 2019) (Flaum, joined by Barrett & Scudder) ("Even if Flora had not waived its joint authorship challenge, we would be quick to conclude that the jury reasonably found Sullivan was the sole author.").

[105] *See, e.g.*, *LG Phillips LCD Co. v. Tatung Co.*, 243 F.R.D. 133, 136 (D. Del. 2007) (applying the policy, fairness, and probability approach articulated in 5 WRIGHT & MILLER § 1271); *Regions Bank v. Tauch*, No. 10-3388 Section "D"(5), 2011 U.S. Dist. LEXIS 55834, at *23 (E.D. La. May 24, 2011)) (taking a more inclusive approach to affirmative defenses because a "defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense.") (quoting *Ingrahm v. U.S.*, 808 F.2d 1075, 1097 (5th Cir. 1987)).

[106] 5 WRIGHT & MILLER § 1271.

[107] *Horan v. Gross*, No. 1"22-CV-1166, 2024 U.S. Dist. LEXIS 5586, at *24-25 (M.D. Pa. Jan. 10, 2024) (quoting *Donohue v. Am. Isuzu Motors Inc.*, 155 F.R.D. 515, 518 (M.D. Pa. 1994)). While *Donohue* claimed only to apply Pennsylvania law, its statement of this distinction is also reflective of Federal practice within this Circuit, as demonstrated by Judge Connor's reliance on its statement of the law in *Horan*. *See also* 5 WRIGHT & MILLER § 1271 ("Generally speaking, the rule's reference to 'any avoidance or affirmative defense' encompasses two types of defensive allegations: those that admit the allegations of the complaint but suggest some other reason why there is no right of recovery, and those that

Circuit has applied this formulation of affirmative defenses, instructing that "a general defense, unlike an affirmative defense, challenges whether the plaintiff has made out a prima facie case."[108] Applying the logical inference test to joint authorship is straightforward. A prima facie copyright infringement claim is established where a plaintiff "show[s] (1) it owns a valid copyright and (2) [defendant] copied protected, original elements *without authorization*."[109]

While it provided no analysis on the issue, at least one treatise on copyright law has categorized joint authorship as a "negative defense" after noting the *prima facie* requirements for proving the ownership of a copyright.[110] This conclusion flows logically from the fact that joint authorship rebuts an allegation of unauthorized copying. Like any other author under the Copyright Act, a joint author's ownership rights "vest[] initially in the author."[111] So "'[j]oint authors'

---

concern allegations outside of the plaintiff's prima facie case that the defendant therefore cannot raise by a simple denial in the answer.").

[108] *Eliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 321 (3d Cir. 2006) (citing *Flav-O-Rich, Inc. v. Rawson Food Serv., Inc.* (*In re Rawson Food Serv., Inc.*), 846 F.2d 1343, 1349 (11th Cir. 1988)); *see also Kaneka Corp. v. Designs for Health, Inc.*, No. 21-209-WCB, 2023 U.S. Dist. LEXIS 131412, at *36 n.4 (D. Del. Mar. 3, 2023); *Davenport v. Toro*, No. 1:16-CV-0494, 2021 U.S. Dist. LEXIS 166956, at * 14 (M.D. Pa. Sept. 2, 2021); *Pelagatti v. Minn. Lawyers Mut. Ins. Co.*, No. 11-7336, 2013 U.S. Dist. LEXIS 90041, at *12 (E.D. Pa. June 25, 2013).

[109] *Pyrotechnics Mgmt. v. XFX Pyrotechnics LLC*, 38 F.4th 331, 335 (3d Cir. 2022) (emphasis added); *Dun & Bradstreet Software Servs., Inc. v. Grave Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002); *see also* 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13D.02 (Matthew Bender, Rev. Ed.) ([W]hether copying "constituent elements of the work that are original . . . embodies two distinct requirements," "factual copying" and "legal copying.").

[110] *See* 4 LESTER HORWITZ ET AL., INTELLECTUAL PROPERTY COUNSELING & LITIG. § 59.07[1][f][ii], *Defendant's Negative Defenses: Joint Work*.

[111] 17 U.S.C. § 201(a).

automatically acquire an undivided ownership interest in the entire work, including all the contributions contained therein."[112] These ownership rights authorize joint authors to use the joint work in whatever way they see fit.[113] It then follows that because showing that one is a joint author of a work necessarily shows that he is authorized to copy the work, joint authorship negates an element of the copyright infringement prima facie case and is an affirmative defense.

### 2.    Merits

Defendants also move for summary judgment on the issue of joint authorship of the dragon boot buttons. Defendants maintain that Helman made a "significant contribution" to the buttons through his "creation of a sculptural work which merged with Plaintiff's contribution resulting in the intended dragon boot button."[114] Beard responds that "Helman's contributions amounted to nothing more than ideas, refinements, and suggestions, in order to adapt Mr. Beard's work into the target medium."[115] I conclude that Helman has made a sufficient contribution such that the dragon boot buttons are a joint work, but that he has not made a sufficient contribution for the Simplified Design to be a joint work.

---

[112] *Phila. Orchestra Ass'n v. Walt Disney Co.*, 821 F.Supp. 341, 347 (E.D. Pa. 1993).

[113] *Williams v. Atl. Recording Corp.*, No. 20-cv-316-RGA, 2020 U.S. Dist. LEXIS 177556, at *4-5 (D. Del. Sept. 28, 2020); *Brownstein v. Lindsay*, 742 F.3d 55, 68 (3d Cir. 2014) (explaining that joint authors' ownership rights allow them to convey their interests to other parties).

[114] Brief in Support of Defendants' Motion for Summary Judgment on Issue of Joint Authorship, Doc. 34, Doc. 34 at 14.

[115] Brief in Opposition to Defendants' Motion for Summary Judgment on Issue of Joint Authorship, Doc. 41 at 11.

### a.   Helman's Contribution

The Copyright Act of 1976 protects "original works of authorship fixed in any tangible medium of expression," including "pictorial, graphic, and sculptural works."[116] The 1976 amendment to the Copyright Act was Congress's first commentary upon "joint works," and it defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."[117] As a joint author's ownership interest "vests from the act of creating the work,"[118] "the joint owner of a copyright cannot sue his co-owner for infringement."[119] But the act provides no further guidance on what kind of contribution must be made to a joint work, and "[t]hese matters are not dealt with at all in the legislation nor in the legislative history."[120]

The issue has therefore proved "open" and "troublesome,"[121] prompting a split among the circuits. The United States Courts of Appeals for the Second, Fourth, Sixth, Ninth, Eleventh, and Federal Circuits have stated that a joint author must contribute an independently copyrightable contribution to the work,[122] as

---

[116]  17 U.S.C. § 102(a)(5).

[117]  17 U.S.C. § 101.

[118]  *Brownstein*, 742 F.3d at 64.

[119]  *Marino v. Usher*, 22 F.Supp. 3d 437, 442 (E.D. Pa. 2014).

[120]  12 NIMMER ON COPYRIGHT IV.

[121]  *Childress v. Taylor*, 945 F.2d 500, 506 (2d Cir. 1991).

[122]  *Id.* at 507-08; *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 255 (2d Cir. 2015); *Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000) ("A 'joint work' in this circuit 'requires each author to make an independently copyrightable contribution' to the disputed

advocated in Goldstein's treatise on copyright law.[123] Applying this standard would likely decide the case in favor of Beard.[124]

However, Nimmer's treatise on copyright law contends that a joint author's contribution need only be more than *de minimis*, not independently copyrightable.[125] The United States Court of Appeals for the Third Circuit has joined the Courts of Appeals for the First Circuit,[126] and to a lesser extent Seventh

---

work.") (quoting *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 521 (9th Cir. 1990)); *Brown v. Flowers*, 196 F. App'x 178, 189 (4th Cir. 2006) (implicitly applying higher standard when rejecting joint authorship claim); *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir. 1990); *BancTraining Video Sys. v. First Am. Corp.*, No. 91-5340, 1992 U.S. App. LEXIS 3677, at *9-10 & n.7 (6th Cir. Mar. 3, 1992); *Gaylord v. United States*, 595 F.3d 1364, 1379-80 (Fed. Cir. 2010).

[123] PAUL GOLDSTEIN, COPYRIGHT: PRINCIPLES, LAW, AND PRACTICE § 4.2.1.2 379 (1989).

[124] Many courts have held that a change of medium, such as changing a two-dimensional work into a three-dimensional model, does not create an independently copyrightable product. *See Andrien v. S. Ocean Cnty. Chamber of Commerce*, 927 F.2d 132, 135 (3d Cir. 1991), citing H.R. Rep. No. 1476 (There is a "'fundamental distinction' between an 'original work' of authorship and 'the multitude of material objects in which it can be embodied.'"); *Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006); *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905 (2d Cir. 1980) (three-dimensional plastic models of two-dimensional Disney characters not copyrightable derivative work); *JCW Investments, Inc. v. Novelty, Inc.*, 289 F.Supp. 2d 1023 (N.D. Ill. 2003) (under the independent copyrightability approach to joint authorship, the developers of the concept of a farting and talking toy doll were the "authors" of the three-dimensional sculpture of the doll, and the doll manufacturers were not joint authors, because the manufacturers' translation of the prototype and pattern into a final product was devoid of original artistic contribution). Defendants do point to countervailing authority from the United States Copyright Office. *See* Defendants' Reply Brief on the Issue of Joint Authorship Doc. 46 at 13 (citing United States Copyright Office Circular 14). Rather than resolving this dispute, the Court instead analyzes whether Helman's contribution rose above a *de minimis* level because that is the applicable standard in the Third Circuit.

[125] 1 NIMMER ON COPYRIGHT § 6.07.

[126] *Greene v. Ablon*, 794 F.3d 133, 151 (1st Cir. 2015) ("It is not necessary that the authors' contributions be quantitatively or qualitatively equal, only that each author's contribution be more than de minimis.") (citing 1 NIMMER ON COPYRIGHT § 6.07[A][1]). Additionally, the United States Court of Appeals for the District of Columbia Circuit endorsed Nimmer's de minimis standard, albeit in dicta. *See Community for Creative Non-Violence v. Reid*, 846 F.2d 1485, 1497 (D.C. Cir. 1988) (Citing Nimmer and explaining that "contribution of each [joint author] must be more than de minimis, [but that] one may qualify as a joint author even

Circuit,[127] in applying a lesser threshold for joint authorship.   In *Brownstein v. Lindsay*, the Third Circuit commented upon the joint authorship doctrine for the first time[128] and adopted Nimmer's *de minimis* joint authorship standard:[129]

> For two or more people to become co-authors, each author must contribute some non-trivial amount of creative, original, or intellectual expression to the work and both must intend that their contributions be combined. The components must also be 'inseparable or interdependent' parts of a whole but each co-author's contribution need not be equal for them to have an equal stake in the work as a whole.[130]

if his contribution, 'standing alone would not be copyrightable,'" but noting that "[w]e are not prepared to rule definitively on this issue, however."), *aff'd on other grounds*, 488 U.S. 1027 (1989).

[127] *See Gaiman v. McFarlane*, 360 F.3d 644, 658-59 (7th Cir. 2004). The Seventh Circuit did not displace its preexisting independent copyrightability rule in *Gaiman*, but by holding that there are "exceptions" to this rule, *Gaiman* nevertheless departed from the independent copyrightability norm. *Gaiman*, 360 F.3d at 658.

[128] *Compare Andrien*, 927 F.2d at 136 ("At this point we need not decide whether each author of a joint work must make an independently copyrightable contribution.") *with Brownstein* at 64-65.

[129] Some authorities claim that *Brownstein* adopted the independent copyrightability test. *See* Restatement of Copyright Law § 22, Reporter's Note (d) (Am. L. Inst. Tentative Draft No. 2, 2022) ("Circuit cases holding that a putative co-author of a joint work must make a copyrightable contribution include: *Brownstein v. Lindsay*, 742 F.3d 55, 64 (3d Cir. 2014)); Justin Hughes, *Actors as Authors in American Copyright Law*, 51 Conn. L. Rev. 1, 59 n. 344 (2019) ("For other appellate decisions adopting the [independent copyrightability] requirement, see . . . *Brownstein v. Lindsay*, 742 F.3d 55, 64 (3d Cir. 2014)."). Others read *Brownstein* as adopting Nimmer's *de minimis* test. *See Cody Foster & Co. v. Urban Outfitters, Inc.*, No. 8:14-CV-80, 2015 U.S. Dist. LEXIS 189532, at *10 n.5 (D. Neb. Sept. 25, 2015) ("Some courts, however, have suggested that the contribution need only be something more than de minimis.") (citing *Greene* and *Brownstein*). As the Third Circuit clearly cited to Nimmer's treatise, stated only that a joint author's contribution must be "non-trivial," and cited to *Gaiman v. McFarlane*'s example of joint authorship involving a professor's non-copyrightable contributions to a book, this Court concludes that *Brownstein* adopted Nimmer's *de minimis* standard, not Goldstein's independent copyrightability test.

[130] 742 F.3d 55, 64. This standard is also favored by the United States Copyright Office. U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 505.2 (3d ed. 2021) ("The Office takes the position that each joint author must contribute a sufficient amount of original authorship to the work . . . By contrast, a collaborator who merely contributes a *de minimis* amount of expression is not considered a joint author.").

But the *de minimis* standard leaves open questions as what quality and kind of contribution qualifies one as a joint author, and little applicable case law exists. This aspect of joint authorship is a rarely litigated issue generally,[131] and is even more rare within the Third Circuit.[132] The *de minimis* standard's relatively recent judicial vintage, and the fact that it is a minority approach, further limits the scope of instructive precedent. The parties therefore recommend several out-of-Circuit standards to assist this Court, but none is instructive in applying the joint authorship test.

Beard first urges this Court to apply the standard that "general ideas, refinements, and suggestions" are not more than a *de minimis* contribution.[133] But because Beard's suggested standard is derived from cases applying the Goldstein independent copyrightability standard, it is inapplicable in this Circuit.[134]

On the other hand, Defendants point to the Ninth Circuit's decision in *Aalmuhammed v. Lee*, which sets out a three-point test for joint authorship bearing

---

[131] *See* JAY DRATLER, INTELLECTUAL PROPERTY LAW § 6.02[3][c][i] ("The extent of contribution necessary to qualify as a joint author remains unsettled. In part this is because the issue will not arise if the parties have addressed it in agreement.").

[132] *See Brownstein*, 742 F.3d at 64 ("Our Circuit has rarely had occasion to venture into the area of joint authorship under the Copyright Act.").

[133] Brief in Opposition to Defendants' Motion for Summary Judgment on Issue of Joint Authorship, Doc. 41 at 10-11.

[134] *Id.* (citing *Big Daddy Games, LLC v. Reel Spin Studios, LLC*, No. 12-cv-449-bbc, 2013 U.S. Dist. LEXIS 200235, at *9 (W.D. Wis. Apr. 10, 2013)). *Big Daddy Games* cited to *Erickson v. Trinity Theatre, Inc.*, which explicitly applied this standard because "ideas, refinements, and suggestions, standing alone, are not the subjects of copyrights." 13 F.3d at 1071-72; *see also Janky v. Lake Cnty Convention & Visitors Bureau*, 576 F.3d 356, 359 (7th Cir. 2009) (applying the "general ideas, refinements, and suggestions" test to determine whether a song contributor's contribution was independently copyrightable).

upon both joint authors' contributions and their intent to be joint authors.[135]

*Aalmuhammed* states that "[a] 'joint work' in this circuit 'requires each author to make an independently copyrightable contribution' to the disputed work."[136] Rather than urging *Aalmuhammed*'s wholesale application, Defendants point to one prong of its three-prong test as instructive: "an author is an individual who creates, or gives effect to the idea, the 'master mind.'"[137] The Ninth Circuit's more fulsome articulation of this prong is as follows:

> [S]everal factors suggest themselves as among the criteria for joint authorship, in the absence of contract. First, an author "superintends" the work by exercising control. This will likely be a person "who has actually formed the picture by putting the persons in position, and arranging the place where the people are to be – the man who is the effective cause of that," or "the inventive or master mind" who "creates or gives effect to the idea."[138]

*Aalmuhammed* was a case about joint authors of a motion picture, which ultimately distinguished the plaintiff from Warner Brothers and Director Spike Lee.[139] Its three-pronged joint authorship test was fashioned against the backdrop of an "independent copyrightability" standard and appears to only have been cited favorably by one magistrate judge within the Third Circuit.[140] Although other

---

[135]  202 F.3d 1227 (9th Cir. 2000).

[136]  *Id.* at 1231.

[137]  Brief in Support of Defendants' Motion for Summary Judgment on Issue of Joint Authorship, Doc. 34 at 17 (citing *Aalmuhammed*).

[138]  *Aalmuhammed*, 202 F.3d at 1234.

[139]  *Id.* at 1235.

[140]  *See Gaines v. Rob Fusari & Rob Fusari Prods., LLC*, No. 11-4433 (WJM), 2012 U.S. Dist. LEXIS 102654, at *15 (D. N.J. July 24, 2012) (Falk, M.J.).

circuits have considered control as bearing upon a joint author's intent,[141] no other circuits appear to have elevated a putative joint author's control as the most important joint authorship factor.[142] More critically, *Aalmuhammed*'s "master mind" or "control" prong was heavily criticized in Nimmer's copyright treatise,[143] a treatise which was highly persuasive to our Court of Appeals in breaking with the majority of circuits.[144] I therefore reject the invitation to apply the most controversial and disputed prong of *Aalmuhammed*'s joint authorship test.

Beard's argument that the dragon boot buttons are not a joint work because Helman's revisions "were merely efforts to adapt the Work to a new medium"[145] is inconsistent with case law applying the Third Circuit's standard. Based on case law applying the *de minimis* contribution standard, I hold that adapting an author's work to a new medium rises above a *de minimis* contribution to a joint work where that adaptation requires the exercise of intellectual creativity and discretion.

---

[141] *See Thomson v. Larson*, 147 F.3d 195, 202-203 (2d Cir. 1991).

[142] *See also M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir. 1990) (rejecting putative joint author's claim of joint authorship over architectural plans despite the fact that it exercised control and discretion over the content of the final project).

[143] 1 NIMMER ON COPYRIGHT § 6.07[B][4] (quoting at length from the authors' amicus brief attempting to jettison *Aalmuhammed*'s control test; "The *Aalmuhammed* court's emphasis on 'control' as the most important factor in the joint authorship analysis is inconsistent with the plain meaning, legislative history, and transparent logic of the Copyright Act's ownership regime . . . The nature of a collaborative enterprise is such that at times different authors will exercise more control than the others over the work. To require a contributor to exercise equal 'inventive control' in order to be a joint author is therefore unrealistic.")

[144] *Brownstein*, 742 F.3d at 64-65 (relying on 1 NIMMER ON COPYRIGHT).

[145] Brief in Opposition to Defendants' Motion for Summary Judgment on Issue of Joint Authorship, Doc. 41 at 11.

Dicta from the United States Court of Appeals for the District of Columbia Circuit's opinion in *Community for Creative Non-Violence v. Reid* presents an analogous factual scenario.[146] *Reid* primarily addressed whether a work was encompassed by the Copyright Act's work for hire doctrine, but it then went on to opine on how it would apply Nimmer's *de minimis* joint work standard, without explicitly adopting it.[147] In *Reid*, a nonprofit organization conceived of an idea for a sculpture to depict "homeless people huddled on a street-side steam grate;" it worked with artists to create the sculpture and hired a cabinetmaker to construct the sculpture's steam grate pedestal.[148]

The nonprofit "conceived the idea in starkly specific detail" and "directed enough of [the sculptor's] effort to assure that, in the end, he had produced what [the nonprofit] not [the sculptor], wanted," so the nonprofit's contributions were "more than [the nonprofit's] abstract idea."[149] Even the steam grate pedestal was significant enough of a contribution to the sculpture that it reflected "more than a minimal amount of creativity."[150] Uncontroversial to the *Reid* court was the contention that the sculptor, too, was a joint author of the work; in rejecting the

---

[146] 846 F.2d 1485 (D.C. Cir. 1988), *aff'd on other grounds*, 490 U.S. 730 (1989).

[147] *Id.* at 1496. Indeed, the *Reid* court lamented that "were it not for the prevailing confusion over the work for hire doctrine, this case—once more taking the record in its current state— might qualify as a textbook example of a jointly-authored work in which the joint authors co-own the copyright." *Id.* at 1497.

[148] *Id.* at 1495.

[149] *Id.* at 1497.

[150] *Id.* at 1495.

sculptor's claims that he was the sculpture's *sole* author, the *Reid* court never implied that the sculptor's contribution was not more than *de minimis*.

Although less analogous to this case than *Reid*, *Brownstein* itself supports this understanding of when adapting a work to a new medium qualifies as a non-*de minimis* creative contribution to a joint work. The *Brownstein* court ultimately concluded that two contributors to a computer program designed to identify a person's ethnicity based upon his or her name were joint authors.[151] One created the set of rules used for the program, such as predicting ethnicities based on suffixes or locations; the other was enlisted to turn those rules into code.[152] As the programmer "had to use his own intellectual creativity to select the computer commands to use," which involved "quite a bit of discretion" and "intellectual creativity," he was a joint author.[153]

This is also demonstrated in the architectural context. In *Meltzer v. Zoller*, a plaintiff created architectural schematic sketches for his new home, and the architect modified the sketches so that they could be adapted to an architectural

---

[151] *Brownstein*, 742 F.3d at 58.

[152] *Id.* at 59.

[153] *Id.* at 65 (cleaned up). The Copyright Act's legislative history also supports finding that adapting a work to a new medium, if it requires intellectual creativity and discretion, rises to more than a *de minimis* contribution. *See* H.R. Rep. No. 1476, 94th Cong., 2d Sess. 52, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5665 ("When a football game [for example] is being covered by four television cameras, with a director guiding the activities of the four cameramen and choosing which of their electronic images are sent out to the public and in what order, there is little doubt that what the cameramen and the director are doing constitutes 'authorship.'").

context and carried out the plans to construct the home.[154] The District of New Jersey held that the architectural firm was an author of the plans, while the plaintiff client was not a joint author of these plans because his sketches were deemed only "ideas" for the home.[155] The viability of *Meltzer*'s latter holding that the plaintiff was not a joint author may be in question in light of this Circuit's later-adopted *de minimis* standard.[156] But the point is that the architectural firm's contributions of creating a model from a rough blueprint entailed the kind of discretion and creativity which conferred it authorship rights.

This is mainly a difference in degree rather than of kind. Nimmer states that to be more than de minimis, an author's contributions to a single work need not "be equal either qualitatively or quantitatively in order to constitute such contributors as joint authors . . . . [But] more than a word or a line must be added by one who claims to be joint author."[157] A contrasting example applying the *de minimis* standard is posed by the more familiar musical context. In *Philadelphia Orchestra Association v. Walt Disney Co.*, the Eastern District of Pennsylvania found that the expressive component of an orchestra's musical performance, which accompanied an animated movie, did not suffice as a non-trivial contribution to the

---

[154] 520 F.Supp. 847, 850 (D.N.J. 1981).

[155] *Id.* at 857.

[156] *See also* 1 NIMMER ON COPYRIGHT § 6.07[A][3][b] (noting that the *de minimis* standard "has been soundly rejected in the architectural context," but citing no Third Circuit case similar to *Meltzer* decided after *Brownstein*).

[157] 1 Nimmer on Copyright § 6.07.

work by the orchestra.[158] While an orchestral performance surely requires the subtle and skillful refinements of a well-trained conductor and musicians, this kind of interpretive performance demands the orchestra to exercise only a narrow range of discretion in translating the composition to the performance, and by so doing it adds little, if any, new content to the composition. This can be contrasted with adding music to song lyrics, an employment of intellectual expression and creativity which renders both the lyricist and the composer joint authors.[159] Likewise, rewriting some of a song's lyrics to make them "singable" supported a joint authorship finding even under the Second Circuit's more demanding standard.[160]

Making a two-dimensional drawing into a three-dimensional button, like creating a program to execute rules or building a house from rough sketches, is a shift in the source material's medium which literally adds a new dimension to the work. Beard testifies that the designs look "very, very similar"[161] in their two-dimensional profiles, but this does not create a relevant issue of fact. The

---

[158] *Phila. Orchestra Ass'n v. Walt Disney Co.*, 821 F.Supp. 341, 347 (E.D. Pa. 1993).

[159] *Marino*, 22 F.Supp. 3d at 339, 444 (where plaintiff created a song's basic melody, chord progressions, and tempo, one co-defendant created the "beat," and another co-defendant wrote the lyrics and reworked the melody, all three people were joint authors); *Shapiro v. Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406, 409 (2d Cir. 1946); *Childress*, 945 F.2d at 504 (lyricist and composer of song were co-authors "even though the lyricist wrote the words before he knew the identity of the composer who would later write the music.").

[160] *Papa's-June Music v. McLean*, 921 F. Supp. 1154 (S.D.N.Y. 1996).

[161] Beard Dep., Doc. 34-2 at 99:10-24 ("I believe that they are an accurate facsimile or a very, very similar to almost an accurate duplicate. In other words, acceptable to anyone that's looking at taking two-dimensional to three-dimensional, yes.").

*Brownstein* court found a computer programmer's contribution to be more than *de minimis* even though turning the list of rules into a computer program involved no change to those rules at all; rather, it was the intellectual discretion and creativity demanded to translate the plans into this new medium which rose beyond a *de minimis* contribution to the emerging joint work. Translating the Original Design into the dragon boot buttons necessitated that Helman add new content to the overall work, and therefore this addition was not just rote or technical.

The fact that this change in medium required changes in the Original Design which appear very modest on the surface does not mean that the intellectual judgment behind those changes reflects no discretion or creativity. According to Helman's undisputed testimony, he rejected at least 15 prior models before he was satisfied with a final product.[162] As Helman testified, this process required more than simply copying Beard's image. It required significant feats of metalworking as well as creativity in design, to simply the original design in strategic areas so that it could be accommodated in metalwork and determine the three-dimensional depth of the image's features.

While of a far lesser degree, the intellectual creativity and discretion required for Helman to adapt the Original Design to the new, three-dimensional medium of metal buttons is analogous to that employed by the sculptor in *Reid* and

---

[162] Beard's rote denials did not create an issue of fact because they merely state that the record "speaks for itself."

the architectural design in *Meltzer*. Metalworking, like programming, is a technique of adapting a co-author's contribution which requires an exercise of "discretion" and "intellectual creativity" to accomplish. The undisputed facts in the record therefore establish that Helman made more than a *de minimis* contribution to the dragon boot button.

However, one key issue highlighted in Beard's copyright infringement complaint is Helman's use of the design in other products, including appliques and sporrans.[163] These designs do not require the three-dimensional sculpting inherent in the metal buttons, but instead involve carving the Simplified Design into leather. As Helman testified, while Beard's Original Design could be reproduced identically in these products, he still used the Simplified Design because he wanted all his dragon products to match the button's appearance. The remaining issue is whether Helman is a joint author in the simplified, two-dimensional rendition of Beard's more complex, two-dimensional concept art.

I conclude that he is not. While sparse case law is available to resolve this issue, it is evident that the creative judgment inherent in simplifying a two-dimensional design does not even rise above a *de minimis* level. Unlike the dragon boot buttons, the Simplified Design does not contribute any creative content to the Original Design. It does not add a new dimension to the Original Design, but rather simply removes parts of it.

---

[163] Complaint, Doc. 1 ¶¶42-48, 55.

That the purpose of this refinement was to pave the way for another product, over which Helman *does* have joint authorship, is irrelevant to any product using that design. The distinction is subtle but crucial. Unlike Helman's contributions to the dragon boot buttons, his contributions to the Simplified Design did not *require* him to deploy his intellectual creativity and discretion.[164] Helman's process for arriving at the Simplified Design was only convoluted because it was an intermediate step towards creating the dragon boot buttons.

Separating out the dragon boot buttons from the Simplified Design is well-grounded in applicable case law. It is true that "'joint authors automatically acquire an undivided ownership interest in the entire work, including all the contributions contained therein."[165] But this is distinct from the joint authors' ownership rights in independent, preceding, underlying works. A work may be "both joint and derivative, with [the original work's author] owning the copyright in the underlying work . . . and co-owning the copyright in the derivative work."[166] Merely using an independent work in a subsequent joint and derivative work does not give the joint author any interest in the original, independent work.[167]

---

[164] *Cf. Papa's-June Music v. McLean*, 921 F. Supp. 1154, 1157 (S.D.N.Y. 1996) (changing lyrics to make them more "singable" was a sufficient contribution).

[165] *Phila. Orchestra Ass'n*, 821 F.Supp. at 347; 1 NIMMER ON COPYRIGHT § 6.03 (2019).

[166] *Greene*, 794 F.3d at 153. *See also Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 522 (9th Cir. 1990) ("Joint authorship in a prior work is insufficient to make one a joint author of a derivative work.") (citing *Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989)).

[167] *See Brownstein v. Lindsay*, 812 F.App'x 75, 78 (3d Cir. 2020) ("[T]he EDS was an 'independent work,' of which Lindsay was the 'sole author. And merely using the EDS in the

Here, the Simplified Design is derivative only of Beard's independent Original Design, and Helman's joint authorship of the dragon boot buttons conferred him no copyright to the Original Design. Helman's use of the Simplified Design may therefore still subject him to liability for copyright infringement.

### b.   Intent

The second element of joint authorship requires that the purported joint authors intend their contributions to be merged into an interdependent or inseparable whole.[168] "Inseparable" contributions "have little or no independent meaning standing alone," while "interdependent" contributions "have some meaning standing alone but achieve their primary significance because of their combined effect."[169]

Beard protests that he "never expressed any desire to be a joint author in the boot buttons or that the Work was a contribution to a joint work." He also protests that because he provided a "limited license to depict the Work on boot buttons," he and Helman did not agree to create a work of joint authorship; "the idea that a purported joint author would need a license to use their joint work is preposterous."[170] Finally, Beard contends that when Helman expressed that he did not wish to "take credit for" Beard's work, Helman demonstrated that he lacked

---

LCID did not affect Lindsay's ownership of her rules, nor give Brownstein any rights in them.").

[168] *See Brownstein*, 742 F.3d at 64; 17 U.S.C. § 101.

[169] *Greene*, 794 F.3d at 150-151 (citing *Childress*, 945 F.2d at 505).

[170] Brief in Opposition to Defendants' Motion for Summary Judgment on Issue of Joint Authorship, Doc. 41 at 13-14.

the necessary intent for joint authorship of the dragon boot buttons.[171] In contrast, Defendants argue that permission to use a copyrighted work helps to establish joint authorship rather than to undermine it.[172] They further allege that the parties' understanding of the legal contours of joint authorship is irrelevant to their intent to create a joint work.[173]

Though the parties do not expressly identify the issue in these terms, their arguments turn on disputed nuances of the joint authorship intent standard. If the Copyright Act requires joint authors only to intend to merge their contributions into a unitary whole, then the only inquiry is whether Beard and Helman intended to merge the Original Design with Helman's metalworking efforts to create the dragon boot buttons. However, if the Copyright Act requires joint authors to intend a joint authorship relationship, then Beard's protests regarding his license agreement, his desire to be a joint author, and Helman's later statements create an issue of fact prohibiting summary judgment.

---

[171] Brief in Opposition to Defendants' Motion for Summary Judgment on Issue of Joint Authorship, Doc. 41 at 13-14; Helman and Beard 2020 Correspondence by Chronology, Doc. 34-3 at 15 ("My idea, any idea is not a copyright. I am not interested in taking credit for your work or ownership of your design . . . I have no desire to take credit for your artistic work."). *But see Greene*, 794 F.3d at 153 (explaining that a work may be "both joint and derivative, with [the original work's author] owning the copyright in the underlying work . . . and co-owning the copyright in the derivative work").

[172] Defendants' Reply Brief on the Issue of Joint Authorship, Doc. 46 at 14 (citing *Sys. XIX, Inc. v. Parker*, 30 F.Supp. 2d 1225, 1230 (N.D. Cal. 1998) *and Bubble Pony, Inc. v. Facepunch Studios Ltd.*, Civil No. 15-601 (DSD/FLN), 2017 U.S. Dist. LEXIS 57820, at *5 (D. Minn. Apr. 14, 2017)).

[173] *Id.* at 10.

### 1.    Law

Our Court of Appeals has not provided much guidance on the requisite intent for joint authorship. It has pulled mainly from the Copyright Act's language itself, stating only that joint authors must "intend that their contributions be combined,"[174] and that they must prepare the work "with the intention that their contributions be merged into *inseparable or interdependent* parts of a *unitary* whole."[175]

The Copyright Act's statutory language "appears to make relevant only the state of mind regarding the unitary nature of the finished work."[176] Under this reading, joint authors need only intend to collaborate on the joint work. However, several courts adhere to the view that something more is required to show an intent to be joint authors. In *Childress v. Taylor*, the United States Court of Appeals for the Second Circuit noted the more straightforward textual interpretation but stated that "an inquiry so limited would extend joint author status to many persons who are not likely to have been within the contemplation of Congress," such as an editor who makes revisions while working with a writer or a research assistant who contributes protectible expression or original selections of facts.[177]

---

[174]   *Brownstein*, 742 F.3d at 64.
[175]   *Brownstein*, 812 F.App'x at 78 (quoting 17 U.S.C. § 101).
[176]   *Childress*, 95 F.2d at 507.
[177]   *Id.*

The *Childress* court therefore stated that "[w]hat distinguishes the writer-editor relationship and the writer-researcher relationship from the true joint author relationship is the lack of intent of both participants in the venture to regard themselves as joint authors."[178] In addition to the Second Circuit, the *Childress* joint authorship intent standard has been adopted by the United States Courts of Appeals for the Seventh and Ninth Circuits and cited favorably by several district courts.[179]

Given the Second and Ninth Circuits' expertise in copyright law, their adoption of this standard is highly persuasive. That said, I agree with countervailing authorities that suggest the joint intent standard adopted by the Second and Ninth Circuits is in error, based upon the statute's text and legislative history, precedent, and persuasive scholarly authorities. As explained below, I hold that joint authors need only share the intent to collaborate on an interdependent or indivisible unitary work; not that there is a further requirement that they contemplate a joint authorship status.

Rather than fashioning multi-factor standards designed to detect the contemplation of joint authorship, courts should leave the scope of the joint

---

[178] *Id.*

[179] *See Aalmuhammed*, 202 F.3d 1227 (9th Cir. 2000); *Erickson*, 13 F.3d 1061, 1068-69; *Price v. Fox Entm't Grp., Inc.*, 473 F.Supp. 2d 446, 454 (S.D.N.Y. 2007); *Tang v. Putruss*, 521 F.Supp. 2d 600, 605 (E.D. Mich. 2007); *Cabrera v. Teatro Del Sesenta, Inc.*, 914 F.Supp. 743, 765 (D.P.R. 1995) (citing *Erickson*, 13 F.3d at 1068; *Childress*, 945 F.2d at 505); *see also Gaines*, 2012 U.S. Dist. LEXIS 102654, at *10 ("As explained by the Ninth Circuit, '[t]he best objective manifestation of a shared intent, of course, is a contract saying that the parties intend to be or not to be coauthors.'") (citing *Aalmuhammed*, 202 F.3d at 1235).

authorship inquiry to Congress. As in any question of statutory interpretation, a court starts with the statute's text. Most notably, the statutory language itself focuses upon the parties' intent regarding their "contributions" to the "joint work," *not* their authorship status, and it only references "authors" when describing who has "prepared" the work: "A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."[180]

The Copyright Act's legislative history supports the intent standard evidenced in its text. The House Report describes the key requirement of a joint work as "the intention, at the time the writing is done, that the parts be absorbed or combined into an integrated unit."[181] "The legislative history of the Copyright Act also states that collaboration is an independent ground for finding the necessary intent for joint authorship:"[182]

> Under the definition of section 101, a work is "joint" if the authors collaborated with each other, *or* if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as "inseparable or interdependent parts of a unitary whole."[183]

Most Courts of Appeals have declined to endorse, or at least declined to comment upon, *Childress*' reading of the Copyright Act's joint authorship intent

---

[180] 17 U.S.C. § 101.
[181] H.R. Rep. No. 94-1476, *reprinted in* 1976 U.S.C.C.A.N. at 5736.
[182] *Words & Data, Inc.*, 765 F.Supp. at 575.
[183] H.R. Rep. No. 94-1476, *reprinted in* 1976 U.S.C.C.A.N. at 5736.

standard. The First, Fifth, Eighth, Eleventh, and District of Columbia Circuits have followed the Copyright Act's language when addressing joint work arguments without discussion of an additional requirement for the collaborators to intend joint authorship. While these courts' discussions "neither explicitly embraced nor rejected either a requirement that there be a shared intent to be co-authors or an inquiry into such an intent as a factor to consider in the joint-work determination,"[184] dicta within these decisions strongly suggests that they have not applied the *Childress* joint intent standard.[185]

Like the preceding Court of Appeals decisions discussed above, *Brownstein* is ambiguous as to the operative joint intent standard because it never explicitly resolved the question of whether some intent to share authorship status, beyond the

---

[184] Restatement of Copyright Law § 22 cmt. (c) (Am. L. Inst. Tentative Draft No. 2, 2022); *See also* Seth F. Gorman, *Who Owns the Movies? Joint Authorship Under the Copyright Act of 1976 after* Childress v. Taylor *and* Thomson v. Larson, 7 U.C.L.A. Ent. L. Rev. 1, 2-3 (1999).

[185] *Greene*, 794 F.3d at 150-151 (analyzing only whether an author "intended his contributions to merge with [his co-author's] into a unitary whole" and finding that "there is no evidence that either [author] believed that [the book] was anything other than a unitary book."); *Easter Seal Soc'y for Crippled Children and Adults, Inc. v. Playboy Enterprises, Inc.* 815 F.2d 323, 336-37 (5th Cir. 1987) (stating that there is no reason why the work for hire doctrine should alter the authorship of a joint work made by a hiring party and an independent contractor and finding a joint work to exist without analyzing the parties' intent to be joint authors); *M.G.B. Homes, Inc.*, 903 F.2d at 1492-93 (relying solely upon the Copyright Act's statutory language that a joint work is prepared "with the intention that [the authors'] contributions be merged into inseparable or interdependent parts of a unitary whole," without applying that intent standard to the case at hand); *Reid*, 846 F.2d at 1496 (citing statutory language regarding joint intent and stating that "[f]rom the original conception of the work through its contemplation for display . . . [it] appears to have been treated by those who labored to create it as a unitary whole"); *Siebersma v. Vande Berg*, 64 F.3d 448, 449 (8th Cir. 1995) (citing to *Words & Data, Inc. v. GTE Comms. Servs., Inc.*, 765 F.Supp. 570, 574-75 (W.D. Mo. 1991), as "setting out standard for joint authorship"); *Words & Data, Inc.*, 765 F.Supp. at 575 (holding that "[t]he legislative history of the Copyright Act also states that collaboration is an independent ground for finding the necessary intent for joint authorship").

intent to collaborate, is required for joint authorship. Despite this ambiguity, *Brownstein*'s analysis at least suggests the less demanding collaborative intent standard. In addition to principally relying upon the Copyright Act's statutory language when discussing the joint authors' intent,[186] *Brownstein* relied solely upon facts relating to those joint authors' collaborative intent: "Appellees admit that . . . Lindsay intended for the EDS to be combined with the computer code he drafted to form the LCID."[187] *Brownstein* also did not discuss any of the traditional factors resorted to by courts applying the *Childress* joint authorship intent standard, including the parties' control over the work,[188] the titles afforded to putative co-authors in crediting and billing,[189] and the scope of legal or contractual rights.[190] So while the *Childress* joint authorship intent standard is followed by the Second and Ninth Circuits, it has not commanded a majority of Circuit courts, and does not appear to have persuaded the *Brownstein* court.

While the scholarly authorities by no means present a united front on this issue, several persuasive commentaries are either ambivalent or opposed to the *Childress* intent standard. Nimmer's copyright treatise notes *Childress*'

---

[186] *Brownstein*, 742 F.3d at 64.

[187] *Id.* at 65. Additionally, the Eastern District of Pennsylvania appeared to follow the collaborative intent approach in *Philadelphia Orchestra Association v. Walt Disney Co.*, although intent was not dispositive to that case. 821 F.Supp. at 347 ("There cannot be any dispute that the performance was rendered with the intention that the music be combined with the animation in 'Fantasia.'").

[188] *See, e.g.*, *id.* at 362; *Aalmuhammed* at 1232-1233; *Thomson*, 147 F.3d at 202-203.

[189] *See, e.g.*, *Janky* at 362; *Aalmuhammed* at 1233-1234; *Childress*, 95 F.2d at 508; *Thomson* at 202-203.

[190] *See, e.g.*, *Childress*, 95 F.2d at 509.

"thoughtful" reasoning on this point but concludes that as "[a] host of confusing issues attend all the cases" analyzing joint authorship in the Second and Ninth Circuits, "the solution would seem to be an expansion of the category of joint owners beyond those who, *ab initio*, intended each other to occupy that status." [191] The United States Copyright Office also hedges to the statutory language,[192] and the American Law Institute's Second Tentative Draft to the Restatement of Copyright Law expressly advocates a collaborative joint intent standard. [193]

*Childress* itself acknowledged that its joint authorship intent standard grated against the Copyright Act's statutory language,[194] but justified its standard based its view of the policy concerns involved in copyright and contract law:

> The wording of the statutory definition appears to make relevant only the state of mind regarding the unitary nature of the finished work – an intention "that their contributions be merged into inseparable or interdependent parts of a unitary whole." However, an inquiry so limited would extend joint author status to many persons who are not likely to have been within the contemplation of Congress . . . . Examination of whether the putative co-authors ever shared an intent to be co-authors serves the valuable purpose of appropriately confining the bounds of joint authorship arising by operation of copyright law, while leaving those not in a true joint authorship

---

[191] 1 NIMMER ON COPYRIGHT § 6.07[B][5].

[192] U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 505.2 (3d ed. 2021) ("Examples of factors that may indicate that a work does not qualify as a joint work include the following: Evidence that one or more of the authors did not intend to merge their contributions into a unitary whole.").

[193] Restatement of Copyright Law § 22 cmt. (c) (Am. L. Inst. Tentative Draft No. 2, 2022).

[194] *Childress*, 945 F.2d at 507 ("The wording of the statutory definition appears to make relevant only the state of mind regarding the unitary nature of the finished work.").

relationship with an author free to bargain for an arrangement that will be recognized as a matter of both copyright and contract law.[195]

Policy concerns aside, this Court's task is not to rewrite the statute; it is to apply the Copyright Act as written. "The question . . . is not what Congress 'would have wanted,' but what Congress enacted."[196] The Second Circuit's concern that joint authorship would stretch too far undergirded *Childress*'s rejection of both Nimmer's *de minimis* standard as well as the collaborative intent standard.[197] As these policy concerns did not persuade our Court of Appeals in the former instance, they are of no more persuasion in the latter. Instead, as noted, our Court of Appeals' only word on the issue of joint authorship intent has been to cite solely to the Copyright Act's statutory language.

Nor is a less demanding intent standard out of line with the policies underlying the Copyright Act. The Copyright Act generally favors the protection of creative expression,[198] and *Childress*' concerns about excessively broad joint ownership rights are regulated in ways other than a strained reading of joint authors' intent. The Second Tentative Draft Restatement on Copyright Law, for example, maintains that:

---

[195] *Id.* at 507-508; *see also Aalmuhammed*, 202 F.3d at 1233 (rejecting collaborative intent standard so that the number of author of complex works can be kept to a manageable number).

[196] ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 270-271 (2012) (quoting *Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992)).

[197] *See Childress*, 945 F.2d at 507-508.

[198] *See Healthcare Advocates v. Harding, Early, Follmer*, 497 F.Supp. 2d 627, 638 (E.D. Pa. 2007) ("The purpose of copyright protection generally is to stimulate creativity for the public good.").

A categorical requirement of shared intent to be co-authors, however, is not directly supported by the statute's text or its legislative history regarding the necessary intent. This Restatement takes the position that the concern that minor contributors to a work not be elevated to the status of joint author is better addressed through an examination of whether the contributor is in fact not just the author of his or her on minor contribution to a larger work but rather is one of the co-authors of that larger work as a unitary whole."[199]

This other element of joint authorship, even under this Circuit's lessened standard, filters out those who make *de minimis* contributions to a creative work. Even where joint authors acquire interests in a work, "[o]ne must hasten to add that acceptance of numerous joint owners of a work need not lead to the conclusion that each shares equally in its exploitation."[200] In any event, "as with all contract matters, the parties may minimize subsequent disputes by formalizing their agreement in a written contract."[201]

Countervailing text, history, precedent, and persuasive scholarly authorities undermine the *Childress* joint author intent standard. I therefore hold that the relevant intent under the Copyright Act is that stated by the Copyright Act itself; the putative joint authors' intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

---

[199]  Restatement of Copyright Law § 22 cmt. (c) (Am. L. Inst. Tentative Draft No. 2, 2022).
[200]  1 NIMMER ON COPYRIGHT § 6.07[B][5].
[201]  *Childress*, 945 F.2d at 507.

## 2.    Application

Resolving this case becomes straightforward once the correct legal standard is identified. There is no dispute of fact that Beard and Helman intended their contributions to the dragon boot buttons to be merged into an inseparable or interdependent unitary whole.

The original agreement between Beard and Helman at least allowed Helman to use Beard's design in dragon boot buttons.[202] Beard's intent for the dragon button design to be molded into a three-dimensional button is further confirmed by Beard's conversations with Helman, in which they discussed the challenges of molding the button in metal.[203] And while Beard was working on circular dragon designs when he created the Original Design, he specifically created the Original Design the weekend after his conversation with Helman with the intent that Helman use it as a basis for his dragon boot buttons. It is also clear that Helman's contribution to the boot buttons is and was intended to be an inseparable contribution; his three-dimensional rendering of Beard's concept art has no independent meaning without the Original Design itself. Therefore, the undisputed

---

[202] Brief in Support of Defendants' Motion for Summary Judgment on Issue of Joint Authorship, Doc. 34 ¶10; Plaintiff's Joint Authorship SOF, Doc. 42 ¶10; Beard Dep., Doc. 34-2 at 127: 14-20.

[203] Beard Dep., Doc. 34-2 at 153:3-14.

facts establish that Helman is a joint author of the dragon buttons, and he cannot be sued for copyright infringement.[204]

In contrast, there also remains an issue of fact as to the parties' intent for the Simplified Design to be a joint work.  Here, both in the initial arrangement and in Beard's drawing, Beard articulated the bounds of his creative endeavor with Helman: "Dragon for Boot Buttons."[205] Even if creating the Simplified Design required more than a *de minimis* creative contribution from Helman, there remains a dispute of fact as to whether Beard intended his Original Design to be merged into the inseparable unitary product of the Simplified Design, as reproduced on other products. Beard and Helman's conflicting accounts create an issue of fact as to this issue which would also preclude summary judgment on Helman's joint authorship of the Simplified Design.

Accordingly, Defendants' motion for summary judgment on the issue of joint authorship is granted as to any copyright infringement claims for their use of the dragon boot buttons but denied as to any copyright infringement claims for their use of the Simplified Design.

---

[204] Joint authors can, however, sue for an accounting of profits. *Williams*, No. 20-cv-316-RGA, 2020 U.S. Dist. LEXIS 177556, at *5 ("Joint authors co-owning copyright in a work are deemed to be tenants in common, with each having an independent right to use or license the copyright, subject only to a duty to account to the other co-owner for any profits earned thereby.") (quoting *Comm. For Creative Non-Violence v. Reid*, 846 F.2d 1485, 1498 (D.C. Cir. 1988)).

[205] Beard Aff., Doc. 34-5 ¶¶ 7-9.

## IV.   CONCLUSION

Defendants' motion for summary judgment is denied in full on the issue of settlement. Defendants' motion for summary judgment is granted in part as to Beard's copyright infringement claims for Defendants' use of the dragon boot button design, and denied as to Beard's copyright infringement claims for Defendants' use of the Simplified Design.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge